(Nos. 81890, 81891, 81892, 81893 cons.— )

VERNON BEST, Appellee, v. TAYLOR MACHINE
WORKS *et al.*, Appellants.—JONATHAN IS-
BELL, Adm'r of the Estate of Steven A. Kelso,
Appellee, v. UNION PACIFIC RAILROAD COM-
PANY *et al.*, Appellants.

*Opinion filed December 18, 1997.*

HEIPLE, J., took no part.
BILANDIC, J., specially concurring.
MILLER, J., concurring in part and dissenting in part.

John W. Hoffman and Michael Reda, of Evans & Dixon, of Edwardsville, for appellant Taylor Machine Works.

Karen L. Kendall, of Peoria, and Robert H. Schultz, Jr., and Robert D. Rowland, of Edwardsville, all of Heyl, Royster, Voelker & Allen, for appellant Lee Helms, Inc.

Timothy M. Palumbo, of Chicago, and Gary S. Wolfe

and John J. Pawloski, of St. Louis, Missouri, all of Landau, Omahana & Kopka, P.C., for appellant Allied Industrial Equipment Corp.

Thomas E. Jones and Leslie G. Offergeld, of Walker & Williams, P.C., of Belleville, and Richard K. Willard, Thomas M. Barba and Brian J. Leske, of Steptoe & Johnson, LLP, of Washington, D.C., for appellants Union Pacific Railroad Co. and Donald F. Cain.

Jon G. Carlson and Eric J. Carlson, of Carlson, Wendler & Associates, P.C., of Edwardsville, Theodore R. Diaz and David W. Dugan, of Pitts, Dugan & Diaz, of Wood River, Charles R. Abele, of St. Louis, Missouri, and Laurence H. Tribe, of Cambridge, Massachusetts, for appellee Vernon Best.

Jon G. Carlson and Eric J. Carlson, of Carlson, Wendler & Associates, P.C., of Edwardsville, and Laurence H. Tribe, of Cambridge, Massachusetts, for appellee Jonathan Isbell.

Barbara A. Preiner, Solicitor General, of Chicago (Deborah L. Ahlstrand, A. Benjamin Goldgar and Laura M. Wunder, Assistant Attorneys General, of counsel), for intervenor James E. Ryan, Attorney General.

Joan M. Mannix and Margaret Pardo, of Addison, for *amicus curiae* Breast Implant Information Exchange.

Kathy Byrne, of Cooney & Conway, of Chicago, for *amici curiae* Brotherhood of Heat & Frost Insulators, Local 17 *et al.*

Ellen A. Yearwood, of Springfield, for *amicus curiae* Illinois NOW Legal & Education Fund.

Tracey L. Meares, of Chicago (Frederick H. Bates and Furmin D. Sessoms, of counsel), for *amici curiae* National Association for the Advancement of Colored People *et al.*

JUSTICE McMORROW delivered the opinion of the court:

This consolidated appeal arises from two personal injury tort actions filed in the circuit court of Madison County, in which the plaintiffs sought declaratory and injunctive relief against enforcement of "An Act to amend certain Acts in relation to civil actions, *** the Civil Justice Reform Amendments of 1995." Pub. Act 89—7, eff. March 9, 1995 (hereafter Public Act 89—7 or the Act). In both cases, plaintiffs sought partial summary judgment on the grounds that the Act violated the Illinois Constitution of 1970. The circuit court of Madison County held the following provisions of Public Act 89—7 unconstitutional: (1) the $500,000 limit on compensatory damages for noneconomic injuries (735 ILCS 5/2—1115.1 (West 1996)), (2) the allocation of fault and several liability provisions (735 ILCS 5/2—1116, 2—1117 (West 1996)), (3) the amendments to the Joint Tortfeasor Contribution Act (740 ILCS 100/3.5, 5 (West 1996)), (4) certain jury instructions (735 ILCS 5/2—1107.1 (West 1996)), (5) the product liability certificate of merit (735 ILCS 5/2—623 (West 1996)), (6) the product liability statute of repose (735 ILCS 5/13—213(b) (West 1996)), (7) the product liability presumptions (735 ILCS 5/2— 2103, 2—2104, 2—2106 (West 1996)) and (8) the discovery statutes which require mandatory disclosure of all of plaintiffs' medical information and records (735 ILCS 5/2—1003, 8—802, 8—2001, 8—2003 (West 1996)). The court also held that Public Act 89—7 is unconstitutional as a whole.

Defendants timely appealed the circuit court's order to this court, and we consolidated the cases. We allowed

the Attorney General, James E. Ryan, to intervene to defend the constitutionality of Public Act 89—7.

We also granted the following organizations leave to submit briefs *amicus curiae*: (1) Illinois Hospital & Healthsystems Association and the Metropolitan Chicago Healthcare Council, (2) Illinois State Medical Society, (3) Product Liability Advisory Council, Inc., (4) Illinois Manufacturers' Association, (5) Illinois Association of Defense Trial Counsel, (6) Illinois Civil Justice League, (7) Illinois State Federation of Labor and Congress of Industrial Organizations and Ironworker's District Council of Greater Chicago, (8) Illinois State Council of Senior Citizens, Families Advocating Injury Reduction (FAIR), Union of Needletrades, Industrial and Textile Employees (UNITE), Coalition for Consumer Rights, Citizen Action/Illinois Chapter, Metro Seniors in Action, Tenth Congressional District AFL-CIO, Champaign County Health Care Consumers, Citizen Advocacy Center and Coalition of Citizens With Disabilities in Illinois, (9) Illinois State Bar Association, (10) National Association for the Advancement of Colored People and the Cook County Bar Association, (11) Illinois NOW Legal and Education Fund and Breast Implant Information Exchange, (12) Chicago Bar Association, and (13) the Brotherhood of Heat and Frost Insulators, Local 17, and the Southeast Environmental Task Force.

The parties agree that Public Act 89—7 effects substantial changes to numerous aspects of tort law. The parties further agree that the challenged provisions of Public Act 89—7 pertain primarily to personal injury actions as distinct from business-related torts, defamation, or other actions not involving physical injury. There is also no dispute that the heart of Public Act 89—7 is the $500,000 limit on compensatory damages for injuries that are considered "non-economic" in nature (735 ILCS 5/2—1115.1 (West 1996)).

Defendants characterize the Act as a legitimate reform measure that is within the scope of the Illinois General Assembly's power to change the common law, shape public policy, and regulate the state's economic health. Plaintiffs counter that the Act uses the guise of reform to erect arbitrary and irrational barriers to meritorious claims, and, therefore, that the Act violates the Illinois Constitution of 1970. Specifically, plaintiffs maintain that the following constitutional provisions are violated by various aspects of the legislation at issue: special legislation (Ill. Const. 1970, art. IV, § 13), equal protection and due process (Ill. Const. 1970, art. I, § 2), separation of powers (Ill. Const. 1970, art. II, § 1), right to a jury (Ill. Const. 1970, art. I, § 13) and right to a certain remedy (Ill. Const. 1970, art. I, § 12).

The role of this court in considering the constitutionality of Public Act 89—7 is not to judge the prudence of the General Assembly's decision that reform of the civil justice system is needed. We recognize that we should not and need not balance the advantages and disadvantages of reform. See *People v. Warren*, 173 Ill. 2d 348 (1996); see also *Cutinello v. Whitley*, 161 Ill. 2d 409 (1994). Rather, as the highest court in this state, we must determine the meaning and effect of the Illinois Constitution in light of the challenges made to the legislation in issue. *Warren*, 173 Ill. 2d at 355-56.

Courts should begin any constitutional analysis with the presumption that the challenged legislation is constitutional (*People v. Shephard*, 152 Ill. 2d 489 (1992)), and it is the plaintiff's burden to clearly establish that the challenged provisions are unconstitutional (*Bernier v. Burris*, 113 Ill. 2d 219 (1986)). However, the Illinois Constitution is not a grant, but a limitation on legislative power. *People v. Chicago Transit Authority*, 392 Ill. 77 (1945); *Italia America Shipping Corp. v. Nelson*, 323 Ill. 427 (1926); *Taylorville Sanitary District v.*

*Winslow*, 317 Ill. 25 (1925). It is this court's duty to interpret the law and to protect the rights of individuals against acts beyond the scope of the legislative power. *People ex rel. Huempfner v. Benson*, 294 Ill. 236 (1920). If a statute is unconstitutional, this court is obligated to declare it invalid. *Wilson v. Department of Revenue*, 169 Ill. 2d 306 (1996). This duty cannot be evaded or neglected, no matter how desirable or beneficial the legislation may appear to be. *Wilson*, 169 Ill. 2d at 310; *Grasse v. Dealer's Transport Co.*, 412 Ill. 179, 190 (1952).

For the reasons stated below, we determine that the following provisions of Public Act 89—7 violate the Illinois Constitution: (1) the limitation on compensatory damages for noneconomic injury (735 ILCS 5/2—1115.1 (West 1996)), (2) section 3.5(a) of the Joint Tortfeasor Contribution Act (740 ILCS 100/3.5(a) (West 1996)), (3) the abolition of joint and several liability (735 ILCS 5/2—1117 (West 1996)), and (4) the discovery statutes which mandate the unlimited disclosure of plaintiffs' medical information and records (735 ILCS 5/2—1003, 8—802, 8—2001, 8—2003 (West 1996)). We further hold that because these unconstitutional provisions may not be severed from the remainder of the act, Public Act 89—7 as a whole is invalid.

## BACKGROUND

Plaintiff, Vernon Best, was injured on July 24, 1995, while he was operating a forklift for his employer, Laclede Steel Company, in Alton, Illinois. The forklift was designed and manufactured by Taylor Machine Works (Taylor) and sold by Allied Industrial Equipment Corporation (Allied). Best sustained injuries when the forklift's mast and support assembly collapsed while Best was moving slabs of hot steel. As a result of the collapse, flammable hydraulic fluid manufactured by Lee Helms, Inc. (Helms), ignited and engulfed Best in a fireball. While on fire, Best leaped from the cab of the

forklift and fractured both heels. Best also suffered second and third degree burns over 40% of his body, including his face, torso, arms and hands.

Best filed a product liability action seeking damages against Taylor, Allied and Helms. In his amended complaint, Best alleges that the forklift and hydraulic fluid were defective and not reasonably safe. As to Taylor and Allied, Best alleges strict product liability, negligence, breaches of implied and express warranties, and breach of warranty for a particular purpose. As to Helms, Best alleges strict product liability, negligence and breach of implied warranty.

Best alleges that he sustained lost earnings, he anticipates diminished future earnings, he has incurred past medical expenses, and he will incur future medical expenses as a result of his injuries. Best anticipates that he will need vocational rehabilitation and convalescent care because of his injuries. He further alleges that his injuries are severe, disfiguring and permanent. Best states that he has suffered and will continue to suffer from grievous pain and anguish from his injuries. He further asserts that he has had a painful and lengthy experience as a patient in a hospital burn unit, and has undergone numerous surgeries.

In his amended complaint, Best seeks compensatory damages for all injuries. Best alleges that he has incurred and will incur noneconomic damages in excess of $500,000. He also seeks declaratory and injunctive relief against Public Act 89—7 on the grounds that the Act violates the Illinois Constitution.

The second action arises out of the death of 20-year-old Steven Kelso, who was killed by a train at a railroad crossing in Madison County, Illinois, on December 12, 1995. At the time of his death, Kelso was driving a truck for his employer. Union Pacific owned the train that killed Kelso, and Donald Cain operated the train at the time of Kelso's death.

Plaintiff Jonathan Isbell, the administrator of Kelso's estate, filed a complaint against Union Pacific and Cain. In the complaint, Isbell alleges that the train that killed Kelso was negligently operated. He states that the train's speed was excessive, it did not adequately warn of its approach, and it failed to slow or stop before the crash. The complaint also alleges that the railroad crossing was negligently constructed, inspected, and maintained, with inadequate warning signals and other deficiencies. Isbell seeks damages under the Wrongful Death Act (740 ILCS 180/1 (West 1996)), the Probate Act of 1975 (755 ILCS 5/27—6 (West 1996)) and the Rights of Married Persons Act (750 ILCS 65/15 (West 1996)). Like Best, Isbell also seeks declaratory and injunctive relief challenging the constitutionality of Public Act 89—7.

In the circuit court, defendants in both actions moved to dismiss the counts for declaratory and injunctive relief, on the grounds that the constitutionality of Public Act 89—7 was not ripe for adjudication. Both plaintiffs filed motions for partial summary judgment on those counts, and entreated the circuit court to invalidate Public Act 89—7. Plaintiffs filed expert opinion affidavits in support of their partial motions for summary judgment. Defendants did not file counteraffidavits.

Upon consolidating the cases, the circuit court denied defendants' motions to dismiss, and granted plaintiffs' motions for partial summary judgment. The circuit court ruled that 15 specific provisions of Public Act 89—7 were unconstitutional and that the Act as a whole was unconstitutional. The court noted that the Act overruled more than 70 decisions of this court and the appellate court, and constituted a "wholesale reconstruction of the judiciary." Pursuant to Supreme Court Rule 302(a) (134 Ill. 2d R. 302(a)), defendants ap-

pealed directly to this court from the circuit court's order declaring Public Act 89—7 invalid.

## ANALYSIS

Initially, we note that in striking down Public Act 89—7, the circuit court referenced the "demeanor" of the legislature during consideration of the Act, as shown by the legislative history. The history of Public Act 89—7 shows that the Act was initially introduced in the House of Representatives as House Bill 20, on November 30, 1994. See generally 25 ILCS 25/2 (West 1994). The legislative synopsis indicates that Public Act 89—7 made "a technical change in a provision relating to product liability actions." House Bill 20 consisted of a suggestion that the word "any" be changed to "a" in the first sentence of section 2—621 of the Code of Civil Procedure (735 ILCS 5/2—621 (West 1992)).

More than two months later, on February 14, 1995, House Bill 20 was released to members of the House as "amended." The amendment to House Bill 20 consisted of 67 pages of text, and mirrors the currently enacted provisions of Public Act 89—7 now before this court. On February 15, 1995, the House Executive Committee held a meeting to consider House Bill 20, and approved it without change. The day following committee approval, House Bill 20 was presented to the full House of Representatives. A majority of the House voted in favor of House Bill 20.

Two weeks later, the Illinois Senate Judiciary Committee held a two-day hearing to consider House Bill 20, and voted to adopt it without change. The bill went to the Senate, where it received the votes necessary for adoption. On March 9, 1995, House Bill 20 was signed into law as Public Act 89—7.

Before the circuit court, plaintiffs argued, and the court agreed, that the "fast track" stratagem adopted by the bill's proponents was designed to curtail delibera-

tion of the bill. Defendants agree that the passage of Public Act 89—7 was swift and drew significant objections on the grounds that adequate time for debate was lacking. However, defendants contend that this fact is not relevant to the determination of the constitutional issues before this court. Because the manner in which Public Act 89—7 was passed is not dispositive of the merits of the constitutional challenges raised by plaintiffs, we do not further consider its genesis. We note, however, that the legislative history of Public Act 89—7 may be considered in ascertaining the intent of the legislature if the resolution of an issue so requires. See, *e.g.*, *People ex rel. Chicago Bar Ass'n v. State Board of Elections*, 136 Ill. 2d 513, 537 (1990) (legislative history is relevant to severability analysis).

## I. Ripeness

In the circuit court, pursuant to section 2—615 of the Code of Civil Procedure (735 ILCS 5/2—615 (West 1992)), defendants moved to dismiss plaintiffs' counts for injunctive and declaratory relief on the grounds that they were not ripe for adjudication. The circuit court rejected defendants' arguments and determined that plaintiffs had standing and that the issues were ripe.

Before this court, defendants maintain that the majority of the circuit court's rulings do not involve an actual case or controversy, which is required to sustain an action for declaratory judgment. They argue that the underlying facts and issues in this case are so premature as to require the court to pass judgment on mere abstract propositions of law, or render an advisory opinion.

The question of ripeness requires a determination with respect to whether there is a case or controversy under section 2—701 of the Code of Civil Procedure (735 ILCS 5/2—701 (West 1992)). A complaint for declaratory judgment must recite in sufficient detail an actual

and legal controversy between the parties and must demonstrate that the plaintiff is interested in the controversy. *First of America Bank, Rockford, N.A. v. Netsch*, 166 Ill. 2d 165 (1995) (declaratory judgment actions permit early resolution of dispositive issues, to fix rights of parties before irrevocable change in their positions jeopardizes their claims of right); see also *Illinois Gamefowl Breeders Ass'n v. Block*, 75 Ill. 2d 443 (1979). This court has repeatedly held that the declaratory judgment statute must be liberally construed and should not be restricted by unduly technical interpretations. See, *e.g., Netsch*, 166 Ill. 2d at 174.

We believe that plaintiffs' complaint challenging the constitutionality of Public Act 89—7 portends "the ripening seeds of litigation." *Miles Kimball Co. v. Anderson*, 128 Ill. App. 3d 805, 807 (1984). For example, plaintiff Best asserts a product liability claim to recover compensatory damages for bodily injuries allegedly sustained at the hands of defendants Allied, Taylor, and Helms. Best alleges that his compensatory damages for noneconomic injuries will exceed $500,000. Public Act 89—7, *inter alia*, limits such damages to $500,000 in all negligence and product liability actions brought on account of death, bodily injury, or physical damage to property. See 735 ILCS 5/2—1115.1 (West 1996). The limitation applies irrespective of whether the court or jury otherwise would have found a larger amount to be appropriate under the facts of the particular case.

We believe that plaintiffs have alleged a sufficient and direct interest in the application of the challenged provisions of Public Act 89—7 to their lawsuits. In deciding the constitutionality of Public Act 89—7 we are not ruling on mere abstract principles of law or prematurely deciding issues in the absence of an actual case or controversy. The course of future litigation in these consolidated cases necessarily will be controlled by reso-

lution of the constitutional challenges to Public Act 89—7. We hold that the issues presented in the instant controversy are ripe for review.

## II. The Cap on Noneconomic Damages

Plaintiffs challenge the $500,000 limit on compensatory damages for noneconomic injuries set forth in section 2—1115.1 of the Code of Civil Procedure (735 ILCS 5/2—1115.1 (West 1996)).

### A. Background to Section 2—1115.1

Section 2—1115.1(a) provides:

> "In all common law, statutory or other actions that seek damages on account of death, bodily injury, or physical damage to property based on negligence, or product liability based on any theory or doctrine, recovery of noneconomic damages shall be limited to. $500,000 per plaintiff. There shall be no recovery for hedonic damages." 735 ILCS 5/2—1115.1(a) (West 1996).

Section 2—1115.1(d) provides that nothing in section 2—1115.1 shall be construed to create a right to recover noneconomic damages. The statute defines "noneconomic damages" as "damages which are intangible, including but not limited to damages for pain and suffering, disability, disfigurement, loss of consortium, and loss of society." 735 ILCS 5/2—1115.2(b) (West 1996). Economic damages, defined as "all damages which are tangible, such as damages for past and future medical expenses, loss of income or earnings and other property loss" (735 ILCS 5/2—1115.2(a) (West 1996)), are not limited. By its terms, the statute defines "compensatory" or "actual" damages as "the sum of economic and non-economic damages." 735 ILCS 5/2—1115.2(c) (West 1996). Thus, compensatory damages, *i.e.*, damages which are intended to make an injured plaintiff whole, are limited by section 2—1115.1.

The cap on compensatory damages for noneconomic injury is, as the parties acknowledge, at the heart of

Public Act 89—7. The key role of this cap is reflected in the preamble to the Act, which contains 18 specific "findings" and eight listed "purposes" based on those findings. Eight of the 18 findings in the preamble pertain to noneconomic damages. These findings declare that: (1) limiting noneconomic damages will improve health care in rural Illinois, (2) more than 20 states limit noneconomic damages, (3) the cost of health care has decreased in those states, (4) noneconomic losses have no monetary dimension, and no objective criteria or jurisprudence exists for assessing or reviewing noneconomic damages awards, (5) such awards are highly erratic and depend on subjective preferences of the trier of fact, (6) highly erratic noneconomic damages awards subvert the credibility of such awards and undercut the deterrent function of tort law, (7) such awards must be limited to provide consistency and stability for all parties and society and (8) "a federal executive branch working group" determined that limiting noneconomic damages was the most effective step toward legislative reform of tort law because it reduces litigation costs and expedites settlement.

In addition to the above legislative "findings," the preamble to Public Act 89—7 states legislative "purposes" which relate to the limit on noneconomic damages. These purposes may be summarized as follows: reduce the cost of health care and increase accessibility to health care, promote consistency in awards, reestablish the credibility of the civil justice system, establish parameters or guidelines for noneconomic damages, protect the economic health of the state by decreasing systemic costs, and ensure the affordability of insurance.

The preamble also declares, "It is the public policy of this State that injured persons injured through negligence or deliberate misconduct of another be af-

forded a legal mechanism to seek compensation for their injuries."

In the circuit court, defendants maintained that the Act and its specified goals represent a return to fairness, predictability, responsibility and rationality in the tort arena. Specifically, defendants argued that the limit on noneconomic damages provides rationality to the system of awarding damages for personal injury.

Plaintiffs, in their motion for partial summary judgment, challenged the legislature's use of chiefly anecdotal evidence to justify the Act.[1] Citing a 1992 report from the National Center for State Courts, plaintiffs noted that businesses, not private personal injury plaintiffs, constitute the most active group of litigants in the state. Plaintiffs further argued that the uncontested empirical evidence that they presented in conjunction with their motion clearly shows that the legislative "findings" listed in the preamble do not provide a rational justification for the limitation of compensatory damages for noneconomic injuries. In support, plaintiffs submitted several affidavits with their motion for sum-

---

[1] An example which was cited frequently in the legislative debates is the infamous McDonald's spilled coffee case. See, *e.g.*, 89th Ill. Gen. Assem., House Proceedings, February 16, 1995, at 79, 89-90, 117-18. As one author has noted, the facts of this case were presented to the public in a skewed fashion. M. Rustad, *Nationalizing Tort Law: The Republican Attack on Women, Blue Collar Workers and Consumers*, 48 Rutgers L. Rev. 673, 720-21 (1996). In that case, it was reported that an 81-year-old woman received a $2.9 million *punitive* damages verdict for injuries incurred after she spilled hot coffee in her lap. However, less widely reported was that the verdict was reduced by the court to $480,000, the elderly woman underwent numerous skin graft operations for third degree burns, and McDonald's had prior knowledge of hundreds of similar scalding incidents. 48 Rutgers L. Rev. at 719 n.228. Also, the excessive award was for punitive, not compensatory, damages.

mary judgment on the constitutionality of section 2—1115.1.

Neil Vidmar, Professor of Social Science and Law at Duke Law School in Durham, North Carolina, submitted an affidavit in which he explains that many of the assertions about medical malpractice litigation contained in the preamble of Public Act 89—7, as well as statements made at the hearing and debates which preceded its passage, have no empirical basis and were based on unsubstantiated perceptions or unreliable data. For example, the perception that damages caps result in a decrease in the number of medical malpractice cases filed was rebutted by the experience in Indiana, a state in which damages caps were adopted in 1975. Vidmar cites studies revealing that Indiana actually has experienced an *increase* in claims. See E. Kinney, W. Gronfein & T. Gannon, *Indiana's Medical Malpractice Act: Results of a Three-Year Study*, 24 Ind. L. Rev. 1275, 1286 (1991). Vidmar states that he is aware of no reliable evidence in the formal studies which indicate that a limit on noneconomic damages corresponds to a significant impact on the cost or availability of health care or that noneconomic damages and the costs of liability insurance are directly linked.

In a separate affidavit, Marc Galanter, Evjue-Bascom Professor of Law at the University of Wisconsin Law School, agrees that there is little evidence, apart from anecdotes, to support the perceived deleterious effects of the present civil litigation system. He cites to an article he authored entitled *Real World Torts: An Antidote to Anecdote*, 55 Md. L. Rev. 1093 (1996). He maintains that the only consequences which clearly flow from the passage of Public Act 89—7 are increased profitability of insurance companies and a reduction in the payments to the most seriously injured tort victims. According to Galanter, court filings in the law division of the circuit

court of Cook County have actually declined during the period from 1980 to 1994. Galanter asserts that arguments which rely on systemic costs of the civil litigation system and its negative effect on health care and jobs are purely speculative. Similarly, he states that the salutary effects attributed to the type of tort reform attempted in Public Act 89—7 are largely speculative. Galanter concludes that when comparing isolated instances or anecdotal evidence against the reliable empirical data that does exist, it is apparent that the findings which form the basis for Public Act 89—7 are erroneous.

In addition to the above affidavits, plaintiffs offered the joint affidavit of Stephen Daniels, M.A., Ph.D., a senior research fellow at the American Bar Foundation in Chicago, and Joanne Martin, M.M., J.D., an assistant director of the same foundation. Their affidavit summarizes the key empirical findings of scholarly literature and compares them to the factual underpinnings of Public Act 89—7. Like Vidmar and Galanter, Daniels and Martin state that the facts which form the stated intention or goals of Public Act 89—7 are not substantiated by the empirical data and critical analyses found in published, scholarly literature. Daniels and Martin summarize data which show that only a tiny fraction of accidental deaths and injuries are pursued through the litigation system as claims for compensation. They further maintain, based on studies, that jury awards are not erratic or capricious, but rather relate closely to the severity of the particular injury.

After considering the arguments of the parties and the materials presented, the circuit court invalidated section 2—1115.1 on the grounds that it violated the following provisions of the Illinois Constitution: special legislation (Ill. Const. 1970, art. IV, § 13), equal protection and due process (Ill. Const. 1970, art. I, § 2), separation of powers (Ill. Const. 1970, art. II, § 1), right to a

jury (Ill. Const. 1970, art. I, § 13) and right to a certain remedy (Ill. Const. 1970, art. I, § 12). The circuit court held that "no conceivable argument [could] be made in good faith to suggest that arbitrarily limiting [compensatory] damages complies with the [Illinois Constitution]." The court determined that section 2—1115.1 constitutes special legislation because it eliminates fairness and impartiality in the awarding of compensatory damages, thereby bestowing on certain tortfeasors a disproportionate, undeserved benefit of escaping liability for a portion of compensatory damages. The court further found that the affidavits filed in support of plaintiffs' opposition to the findings in the preamble to Public Act 89—7 demonstrate that there is no rational basis for section 2—1115.1.

Our review of the circuit court's ruling is *de novo.* See *Bernier,* 113 Ill. 2d at 230. As such, our scope of review is not limited to or bound by any specific material relied upon by the circuit court. We acknowledge that the trial court considered the affidavits of Vidmar, Galanter, Martin and Daniels in its ruling on plaintiffs' motions for partial summary judgment. The materials were admitted in support of plaintiffs' claim that the provisions of the Act are not rationally related to its purposes. While we note that it was permissible for plaintiffs to introduce empirical evidence by way of affidavit, plaintiffs may not prevail on their constitutional challenges merely by showing that the General Assembly was mistaken in its legislative findings of fact. *Bernier,* 113 Ill. 2d at 229-30, citing *United States v. Carolene Products Co.,* 304 U.S. 144, 153-54, 82 L. Ed. 1234, 1242, 58 S. Ct. 778, 784 (1938). Courts are not empowered to "adjudicate" the accuracy of legislative findings. The legislative fact-finding authority is broad and should be accorded great deference by the judiciary. Therefore, to the extent the affidavits of record may have been offered

to contest the wisdom of the legislative enactment, we reiterate that the legislature is not required to convince this court of the correctness of its judgment that the civil justice system needs reform. See *Bernier*, 113 Ill. 2d at 229, citing *Vance v. Bradley*, 440 U.S. 93, 111, 59 L. Ed. 2d 171, 184-85, 99 S. Ct. 939, 949-50 (1979); see also *Cutinello v. Whitley*, 161 Ill. 2d 409 (1994). Our task is limited to determining whether the challenged legislation is constitutional, and not whether it is wise. *Bernier*, 113 Ill. 2d at 230.

## B. Special Legislation

In this court, plaintiffs challenge the constitutionality of the damages cap, section 2—1115.1, on the basis that it violates the special legislation clause of the Illinois Constitution (Ill. Const. 1970, art. IV, § 13). Plaintiffs maintain that for individuals whose injuries are minor or moderate, the limit will rarely, if ever, be implicated. Instead, the limit is imposed only when a jury or trial court finds, and the reviewing court agrees, that an award of compensatory noneconomic damages in excess of $500,000 is required to make the plaintiff whole. According to plaintiffs, section 2—1115.1 impermissibly penalizes the most severely injured individuals, whose pain and suffering, disfigurement, and other noneconomic injuries would be most likely to result in a compensatory award in excess of $500,000 but for the statutory limit. Similarly, plaintiffs reason, the damages cap arbitrarily benefits certain tortfeasors, who are relieved of liability for fully compensating plaintiffs. Thus, plaintiffs maintain, section 2—1115.1 constitutes special legislation.

The special legislation clause of the Illinois Constitution provides:

"The General Assembly shall pass no special or local law when a general law is or can be made applicable. Whether a general law is or can be made applicable shall

be a matter for *judicial* determination." (Emphasis added.) Ill. Const. 1970, art. IV, § 13.

It has been noted that the prohibition against special legislation is the "one provision in the legislative articles that specifically limits the lawmaking power of the General Assembly." S. Grove & R. Carlson, *The Legislature,* in Con-Con: Issues for the Illinois Constitutional Convention 101, 103 (1970). The special legislation clause expressly prohibits the General Assembly from conferring a special benefit or exclusive privilege on a person or a group of persons to the exclusion of others similarly situated. *In re Petition of the Village of Vernon Hills,* 168 Ill. 2d 117, 122 (1995). This court has consistently held that the purpose of the special legislation clause is to prevent arbitrary legislative classifications that discriminate in favor of a select group without a sound, reasonable basis. *Wright v. Central Du Page Hospital Ass'n,* 63 Ill. 2d 313 (1976) (invalidating $500,000 cap on damages in medical malpractice actions); *Grace v. Howlett,* 51 Ill. 2d 478 (1972) (striking classifications that conditioned recovery for personal injuries upon fortuity of whether negligent driver was using vehicle for commercial or private purposes); *Grasse v. Dealer's Transport Co.,* 412 Ill. 179 (1952) (invalidating discriminatory classifications of employers, employees, and third-party tortfeasors in workers' compensation provision).

Special legislation analysis is deeply embedded in the constitutional jurisprudence of this state. The ban on special legislation originally arose in the nineteenth century in response to the General Assembly's abuse of the legislative process by granting special charters for various economic entities. D. Ruder, *Business Regulation: Corporations,* in Con-Con: Issues for the Illinois Constitutional Convention 382, 382-83 (1970). The special legislation clause in the Constitution of 1870 enumerated over 20 specific categories in which the Gen-

eral Assembly was prohibited from passing a local or special law. Ill. Const. 1870, art. IV, § 22. The distinction between special and local laws may be stated as follows:

"A local law is one which applies only to the government of a portion of the territory of the state, and a special law is one which applies only to a portion of the state—its people, its institutions, its economy—in some sense other than geographical." G. Braden & R. Cohn, The Illinois Constitution: An Annotated & Comparative Analysis 206-07 (1969).

Delegates to the 1870 constitutional convention criticized special legislation because, instead of establishing and enforcing general principles applicable to every class of citizens, special legislation enriched particular classes of individuals at the expense of others. I Debates and Proceedings of the Constitutional Convention of the State of Illinois 578 (remarks of Delegate Anderson). Delegate Anderson spoke in favor of the prohibition against special legislation and stated:

"Governments were not made to make the 'rich richer and the poor poorer,' nor to advance the interest of the few against the many; but that the weak might be protected from the will of the strong; that the poor might enjoy the same rights with the rich; that one species of property might be as free as another—that one class or interest should not flourish by the aid of government, whilst another is oppressed with all the burdens." I Debates, at 578 (remarks of Delegate Anderson).

Evidently in recognition of the value of the prohibition against special legislation, the framers of the Illinois Constitution of 1970 decided to retain the clause, with some modifications. See *Anderson v. Wagner*, 79 Ill. 2d 295, 313-14 (1979). First, because the enumerated categories in the constitution of 1870 clearly reflected the nineteenth century concerns which had lost their relevance with the passage of time, the framers of the 1970 constitution omitted the "laundry list" of prohib-

ited categories. See G. Braden & R. Cohn, The Illinois Constitution: An Annotated & Comparative Analysis 225-26 (1969). Additionally, the 1970 constitution rejected the previous rule which had vested in the legislature the power to determine whether a general law could be made applicable. *Bridgewater v. Hotz*, 51 Ill. 2d 103, 110 (1972). Thus, the present version of the special legislation clause contains an express grant of power to the judiciary: "Whether a general law is or can be made applicable shall be a matter for judicial determination." Ill. Const. 1970, art. IV, § 13.

The framers of the 1970 constitution retained the special legislation prohibition even though an equal protection/due process clause was included in the Illinois Constitution for the first time. See Ill. Const. 1970, art. I, § 2 ("No person shall be deprived of life, liberty or property without due process of law nor be denied the equal protection of the laws").

A special legislation challenge generally is judged under the same standards applicable to an equal protection challenge. *Village of Vernon Hills*, 168 Ill. 2d at 123. Public Act 89—7 does not affect a fundamental right or involve a suspect or quasi-suspect classification. See *Bernier*, 113 Ill. 2d at 227-29.[2] Thus, the appropriate standard for our review of Public Act 89—7 is the rational basis test. "Under this standard, a court must determine whether the statutory classification is rationally related to a legitimate State interest." *Village of Vernon Hills*, 168 Ill. 2d at 123.

Our task in determining whether the damages cap

---

[2]In *Bernier*, this court declined to apply a standard stricter than rationality review to medical malpractice legislation. This court rejected the intermediate test employed by the Supreme Court of New Hampshire in *Carson v. Maurer*, 120 N.H. 925, 424 A.2d 825 (1980) and by the Supreme Court of North Dakota in *Arneson v. Olson*, 270 N.W.2d 125 (N.D. 1978). We adhere to the *Bernier* holding for purposes of evaluating section 2—1115.1.

violates the special legislation clause is not without difficulty. See *Grasse*, 412 Ill. at 194. Indeed, the dilemma in discerning whether or not a particular statute constitutes special legislation has been described as follows:

> "It is impossible to conceive of a law that has universal impact and affects everyone or everything in the same way. By enacting laws, the legislature can hardly avoid excluding some category of people or objects. In enforcing this prohibition, the courts must decide if the legislature has made a reasonable classification. Differences of opinion are bound to exist in such situations and the ultimate decision must rest with some judgment as to the soundness of the legislature's action." S. Grove & R. Carlson, *The Legislature*, in Con-Con: Issues for the Illinois Constitutional Convention 106 (1970).

The difficulty is not overcome by merely reiterating that a classification has been made, *i.e.*, that the legislature has in some way classified groups of people. Rather, we must determine whether the classifications created by section 2—1115.1 are based upon reasonable differences in kind or situation, and whether the basis for the classifications is sufficiently related to the evil to be obviated by the statute. *Grasse*, 412 Ill. at 195. We note that the legislature has wide discretion in the exercise of its police power. However, in evaluating a challenged provision the court must consider the natural and reasonable effect of the legislation on the rights affected by the provision. *Grasse*, 412 Ill. at 193.

While it is unnecessary to discuss every Illinois Supreme Court case which has evaluated legislation in the context of the special legislation clause, we note the many cases cited by both plaintiffs and defendants in the case at bar. Defendants cite numerous cases in which this court has rejected challenges to legislation on special legislation and equal protection grounds. See, *e.g.*, *Brown's Furniture, Inc. v. Wagner*, 171 Ill. 2d 410 (1996) (upholding constitutionality of a use tax); *Cutinello v. Whitley*, 161 Ill. 2d 409 (1994) (upholding

constitutionality of a county motor fuel tax law); *People v. Shephard*, 152 Ill. 2d 489 (1992) (upholding constitutionality of criminal statute which allowed an enhanced penalty for selling narcotics with an intent to deliver if the situs of the crime is within 1,000 feet of public housing); *Chicago National League Ball Club, Inc. v. Thompson*, 108 Ill. 2d 357 (1985) (upholding constitutionality of an environmental regulation which monitored nighttime baseball games); *Bilyk v. Chicago Transit Authority*, 125 Ill. 2d 230 (1988) (upholding constitutionality of immunity for a transit authority for failure to protect against criminal acts of third parties).

In contrast to the above cases, this court has invalidated legislative classifications under the special legislation clause where they have an artificially narrow focus and which appear to be designed primarily to confer a benefit on a particular private group without a reasonable basis, rather than to promote the general welfare. See, *e.g.*, *In re Belmont Fire Protection District*, 111 Ill. 2d 373, 381-86 (1986) (invalidating a statute which authorized only counties with populations of between 600,000 and 1 million residents to consolidate all fire protection services into one district); *Wright v. Central Du Page Hospital Ass'n*, 63 Ill. 2d 313, 325-30 (1976) (invalidating $500,000 limit on compensatory damages in medical malpractice actions); *Grace v. Howlett*, 51 Ill. 2d 478, 486-87 (1972) (invalidating a limit on recovery applicable to damages inflicted by commercial motorists, but not private motorists); *Skinner v. Anderson*, 38 Ill. 2d 455, 459-60 (1967) (invalidating a statute of repose for construction-related injuries for architects and contractors, but not other potential defendants in the construction process); see also *Lorton v. Brown County Community Unit School District No. I*, 35 Ill. 2d 362, 364-66 (1966); *Hutchings v. Kraject*, 34 Ill. 2d 379, 380-82 (1966); *Harvey v. Clyde Park District*, 32 Ill. 2d 60, 64-67

(1964). As the above-cited cases reveal, the hallmark of an unconstitutional classification is its arbitrary application to similarly situated individuals without adequate justification or connection to the purpose of the statute.

In the case at bar, plaintiffs specifically rely on the following three decisions of this court which held invalid as special legislation certain statutes which created arbitrary classifications between groups of similarly situated injured plaintiffs or tortfeasors: *Wright v. Central Du Page Hospital Ass'n*, 63 Ill. 2d 313 (1976); *Grace v. Howlett*, 51 Ill. 2d 478 (1972); *Grasse v. Dealer's Transport Co.*, 412 Ill. 179 (1952). Because plaintiffs maintain that these precedents of this court are controlling with respect to the constitutionality of section 2—1115.1, we discuss them in detail.

In *Wright*, this court held that a $500,000 limit on compensatory damages in medical malpractice actions (Ill. Rev. Stat. 1975, ch. 70, par. 101) violated the equal protection and special legislation provisions of the Illinois Constitution. Like plaintiffs in the case at bar, the plaintiff in *Wright* argued that the compensatory damages limit arbitrarily classified and unreasonably discriminated against the most seriously injured victims of medical malpractice. Like defendants in the case at bar, the defendants in *Wright* argued that a compensatory damage limit was necessary to manage a liability crisis, specifically a "medical malpractice crisis." The plaintiff maintained, however, that the burden of the legislative effort to reduce or maintain malpractice insurance premiums arbitrarily fell exclusively on those most deserving of compensation: the severely injured.

The *Wright* court noted that unlike statutorily created causes of action (see *Hall v. Gillins*, 13 Ill. 2d 26 (1958); *Cunningham v. Brown*, 22 Ill. 2d 23 (1961)), the right to recover for injuries arising from medical mal-

practice existed at common law.[3] See *Ritchey v. West*, 23 Ill. 329 (1860). Thus, the limitations on that right of action were subject to constitutional scrutiny. Specifically, in *Wright*, this court concluded that the General Assembly did not have the power to prescribe arbitrary limitations on an injured plaintiff's compensatory damages. The limitation on compensatory damages in medical malpractice actions was determined to be arbitrary and a special law in violation of the special legislation clause of the Illinois Constitution of 1970. The damages limit conferred a special privilege on medical malpractice tortfeasors by insulating them from fully compensating plaintiffs for fairly assessed damages. Consequently, relief to an injured plaintiff depended solely on an arbitrary classification, in violation of the prohibition against special legislation. *Wright*, 63 Ill. 2d at 329-30.

Similarly, in *Grace*, this court held that a statute which limited recovery for certain automobile accident victims constituted an arbitrary and unreasonable legislative classification in violation of the prohibition against special legislation. At issue in *Grace* was a newly enacted article to the Illinois Insurance Code (Ill. Rev. Stat. 1971, ch. 73, pars. 1065.150 through 1065.163). The plaintiffs brought an action for injunctive relief against state officers to enjoin them from expending funds appropriated for the enforcement of the new article. The combined effect of certain provisions of the new law was

---

[3]In *Hall v. Gillins*, 13 Ill. 2d 26 (1958), this court upheld as constitutional a cap on damages obtainable under the Wrongful Death Act because the legislature created both the right and the remedy. As such, this court held that the legislature's right to limit the maximum recovery could not be questioned. *Hall*, 13 Ill. 2d at 29. Likewise, in *Cunningham v. Brown*, 22 Ill. 2d 23 (1961), this court held that the damages cap contained in the Dramshop Act of 1872 passed constitutional muster because the cause of action was a creature of statute; *i.e.*, no common law cause of action existed against a supplier of alcohol.

to limit an injured plaintiff's ability to recover compensatory damages, including damages for pain and suffering, depending on whether the party at fault was using the automobile for commercial or personal purposes.

The defendants in *Grace* described the amendment to the Insurance Code as a response to the growing public demand for a change in the way society copes with the enormous legal, social and economic problems produced by car accidents. The defendants identified small personal injury actions as one of the major evils of the system of compensating car accident victims. *Grace*, 51 Ill. 2d at 484. The defendants further maintained that the studies regarding car accident compensation identified many problems with the system of compensating injured individuals. Specifically, the defendants maintained that the studies showed the inequitable distribution of compensation among victims, the excessive expense of the claim system, and the excessive burden on limited judicial resources. According to the defendants, the changes to the Insurance Code were rationally connected to legitimate government concerns.

In determining whether the provisions at issue violated special legislation and equal protection, the *Grace* court assumed that the problems described by the defendants in fact existed. However, the court reasoned, the fact that a problem exists does not permit the adoption of an arbitrary or unrelated means of addressing the problem. *Grace*, 51 Ill. 2d at 485. In rejecting the defendants' argument that the legislation was a permissible exercise of legislative power, the *Grace* court stated,

> "Unless this court is to abdicate its constitutional responsibility to determine whether a general law can be made applicable, the available scope for legislative experimentation with special legislation is limited, and this court cannot rule that the legislature is free to enact special legislation simply because 'reform may take one step at a time.' [Citation.]" *Grace*, 51 Ill. 2d at 487.

This court concluded that to the extent that recovery is permitted or denied on an arbitrary basis, a special privilege was granted in violation of the prohibition against special legislation. *Grace,* 51 Ill. 2d at 487-90.

In *Grasse,* this court invalidated a provision of the Worker's Compensation Act that created arbitrary classifications. At issue in *Grasse* was a provision which automatically transferred to an employer, in certain cases, an employee's common law right of action against a third-party tortfeasor. In *Grasse,* the plaintiff and his employer filed claims against a private defendant to recover damages stemming from an automobile collision which was allegedly caused by the negligence of the defendant's employee. Because both the plaintiff and defendant's employee were acting in the course of their employment at the time of the accident, paragraph 1 of section 29 of the Worker's Compensation Act applied to the subsequent litigation. This provision authorized the automatic transfer of the plaintiff-employee's claim against the third-party tortfeasor to the plaintiff's employer. The circuit court consequently dismissed the plaintiff's claim against the third-party tortfeasor.

On appeal to this court, the plaintiff alleged, in part, that the statute violated the special legislation clause of the Illinois Constitution (Ill. Const. 1870, art. IV, § 22) because it created arbitrary and unreasonable classifications. This court agreed, holding that the statute created unreasonable classifications in which the plaintiff's ability to recover complete compensation was determined by fortuitous circumstances. The statute divided injured employees into two arbitrary classes based solely on the fortuity of whether or not the third-party tortfeasor was also bound by the provision. One class was deprived of the right to collect compensatory damages from the tortfeasor and the other class, which was similarly situated, was conferred such right. This court

concluded that there was no substantial or rational difference between the injured employees in the two classes and, therefore, the statute offended the prohibition against special legislation.

In addition to the unequal treatment of injured employees, the *Grasse* court determined that the statute divided third-party tortfeasors into two classes: those bound by the worker's compensation provision, who were freed from paying compensatory damages to employees of other entities under the act, and all other tortfeasors, who remained liable for the full amount of fairly assessed compensatory damages. The first class of tortfeasors were only required to pay amounts sought by the employer as reimbursement for worker's compensation payments. In contrast, the second class of tortfeasors remained liable to the plaintiff for the full amount of compensatory damages assessed by a trier of fact. Therefore, the distinctions were arbitrary and constituted a violation of the special legislation clause. *Grasse*, 412 Ill. at 199.

Defendants maintain that plaintiffs' reliance on *Wright, Grace,* and *Grasse* is misplaced. According to defendants, these cases were limited by *Anderson v. Wagner*, 79 Ill. 2d 295 (1979), in a way that renders their holdings inapplicable to the legislation in the case at bar.

At issue in *Anderson* was section 21.1 of the Limitations Act (Ill. Rev. Stat. 1977, ch. 83, par. 22.1), which provided a special statute of limitations period for medical malpractice actions against physicians and hospitals. The plaintiffs in *Anderson* contended that section 21.1 violated the due process and equal protection provisions of the state and federal constitutions, and the special legislation provision of the Illinois Constitution. The plaintiff maintained that section 21.1 violated the special legislation clause because it (1) set medical mal-

practice apart from all other professional malpractice and (2) conferred a special privilege upon only two classes of medical health providers, physicians and hospitals. Following an extensive analysis of the development of the discovery rule in medical malpractice cases, and the impact on physicians and hospitals, this court rejected the plaintiff's constitutional challenge to the statute of limitations provision at issue.

In analyzing the plaintiff's challenges, the *Anderson* court retraced the evolution of the "discovery rule" in medical malpractice cases. Under the discovery rule, a cause of action accrued when a person learned of his injury or reasonably should have learned of it. Because the discovery rule came to be applied extensively in medical malpractice cases, statutes of limitation in existence no longer provided repose for malpractice defendants. The discovery rule was perceived to be partly responsible for the medical malpractice crisis because it created a "long tail" of liability for medical malpractice defendants. Thus, the statute of limitations provision at issue in *Anderson* was enacted to place an outside limit on the applicability of the discovery rule to physicians and hospitals. *Anderson*, 79 Ill. 2d at 316-21. We find that *Anderson* is distinguishable from the instant case because in *Anderson*, the General Assembly was responding to judicial expansion of the discovery rule, which had undermined the medical malpractice statute of limitation by creating a tolling provision of potentially unlimited duration.

Defendants in the instant case also rely upon language in *Anderson* which responded to critics of *Wright*. In *dicta*, the *Anderson* court explained that *Wright* did not hold that all statutory provisions creating medical malpractice review panels were unconstitutional. The *Anderson* court also noted that *Wright*'s holding regarding the limit on economic damages was

consistent with American Bar Association standards which recommend against any limitation on economic loss. *Anderson,* 79 Ill. 2d at 304. However, this court in *Anderson* did not consider the General Assembly's authority to place a limit on compensatory damages for noneconomic injuries. We reject defendants' argument that our decision in *Anderson* limits *Wright's* application in the case at bar.

Plaintiffs argue that section 2—1115.1 merely stitches together legislative classifications previously rejected in *Wright, Grasse* and *Grace,* and then adds product liability cases. According to plaintiffs, section 2—1115.1 contains three arbitrary classifications that have no reasonable connection to the stated legislative goals: (1) the limitation on noneconomic damages distinguishes between slightly and severely injured individuals, (2) the limitation on noneconomic damages arbitrarily distinguishes between individuals with identical injuries, and (3) the limitation arbitrarily distinguishes types of injury. At oral argument, plaintiffs offered examples illustrating how the limitation on noneconomic damages is disconnected from the stated legislative purposes of providing rationality and consistency to jury verdicts.

In the first example, it is assumed that three plaintiffs are injured as a result of the same tortfeasor's negligence. Plaintiff A is injured moderately, and suffers pain, disability and disfigurement for a month. Plaintiff B is severely injured and suffers one year of pain and disability. Plaintiff C is drastically injured, and suffers permanent pain and disability. For purposes of this example, it is further assumed that a jury awards plaintiffs A and B $100,000 in compensatory damages for noneconomic injuries. Plaintiff C receives $1 million for his permanent, lifelong pain and disability.

In the above hypothetical, section 2—1115.1 fails to

provide consistency or rationality to a jury's seemingly inconsistent decision to award plaintiffs A and B the same amount for very different noneconomic injuries. Therefore, the legislative goal of providing consistency is not met by the damages cap. With respect to plaintiff C, section 2—1115.1 arbitrarily and automatically reduces the jury's award for a lifetime of pain and disability, without regard to whether or not the verdict, before reduction, was reasonable and fair.

The tortfeasors in this example are also treated differently, without any justification. The tortfeasor who injures plaintiffs A and B is liable for the full amount of fairly assessed compensatory damages. In contrast, section 2—1115.1 confers a benefit on the similarly situated tortfeasor who injures plaintiff C. This tortfeasor pays only a portion of fairly assessed compensatory damages because of the limitation in section 2—1115.1. Therefore, the statute discriminates between slightly and severely injured plaintiffs, and also between tortfeasors who cause severe and moderate or minor injuries.

Plaintiffs suggest that section 2—1115.1 creates a second arbitrary legislative classification by distinguishing between injured individuals who suffer identical injuries. For example, we are asked to assume that an individual loses his leg due to a defectively manufactured forklift today, and he loses his other leg in a car accident the following year. Both injuries are caused by the negligent conduct of others. The injured individual brings two different actions against two different defendants, and a jury assesses compensatory damages for noneconomic injuries at $400,000 in each case. Section 2—1115.1 would allow the plaintiff to recover both verdicts in full. However, if the same plaintiff lost both legs in a single accident due to the negligence of another, and if the jury fairly assessed $800,000 in compensatory damages for noneconomic injuries, then

the cap in section 2—1115.1 would eliminate a substantial portion of that tortfeasor's liability, without regard to the facts of the case.

To illustrate the third arbitrary classification created by the limitation on noneconomic damages in personal injury actions, plaintiffs argue that section 2—1115.1 improperly discriminates among types of injuries. Plaintiffs maintain that the legislative statements concerning the supposed difficulties of assessing damages for noneconomic injuries apply equally to all tort claims for pure noneconomic loss, and not just those involving death, bodily injury or property damage. Other torts that remain unaffected by the legislation at issue are invasion of privacy, defamation, intentional infliction of emotional distress, negligent infliction of emotional distress, damage to reputation and breach of fiduciary duty. The speculative nature of noneconomic damages for these torts, which do not involve personal injury, is not addressed by the cap in section 2—1115.1.

Plaintiffs maintain that the above illustrations demonstrate the arbitrariness of the classifications created by section 2—1115.1, in violation of the prohibition against special legislation. Plaintiffs contend that the classifications contained within section 2—1115.1 allow certain culpable tortfeasors to escape liability for a portion of fairly assessed compensatory damages, while requiring others to pay the full amount of assessed damages. Similarly, certain injured plaintiffs are denied compensatory damages, while other similarly situated injured plaintiffs are awarded full compensation, without any rational justification for the distinction.

Defendants raise a series of related arguments in opposition to plaintiffs' contention that section 2—1115.1 is arbitrary and not rationally related to a legitimate government interest. Defendants contend that plaintiffs' arguments are "fatally flawed" in that they are based

on the erroneous assumption that noneconomic injuries, which are difficult to assess, should be monetarily compensable. Defendants further argue that section 2—1115.1 is rationally related to the legislative goal of reducing systemic costs of the civil justice system, which may be accomplished "one step at a time"; that the General Assembly has the power to change the common law; and that other jurisdictions have upheld statutory limitations on damages similar to section 2—1115.1. We address each of defendants' arguments in turn.

At oral argument, in rebuttal, defendants stated that "it is not true that money can compensate for noneconomic damages, [or] at least the legislature could find that that is the case." Defendants do not dispute the general proposition that noneconomic injuries are "real." Rather, defendants argue that noneconomic damages are "inherently unmeasurable." Thus, according to defendants, the legislature's adoption of an "objective" limitation on noneconomic damages is reasonable and must be upheld as a legitimate exercise of legislative judgment.

Defendants' argument contradicts the statute under consideration. Subsection (b) of section 2—1115.1 defines noneconomic loss or noneconomic damages as "damages which are intangible, including but not limited to damages for pain and suffering, disability, disfigurement, loss of consortium and loss of society." Subsection (c) provides that "compensatory damages" or "actual damages" are "the sum of the economic and noneconomic damages." Section 2—1115.1 itself demonstrates that the legislature believed that remuneration is an appropriate means by which to compensate tort victims for their noneconomic injuries. Therefore, the application of a limit to the noneconomic damages of some, but not all, injured plaintiffs is not justified by the difficulty of assessing such damages.

We do not disagree with defendants' assertion that damages for noneconomic injuries are difficult to assess. We simply determine that it does not follow that the difficulty in quantifying compensatory damages for noneconomic injuries is alleviated by imposing an arbitrary limitation or cap on all cases, without regard to the facts or circumstances. Further, the preamble to Public Act 89—7 states that "[i]t is the public policy of this State that persons injured through the negligence or deliberate misconduct of another be afforded a legal mechanism to seek compensation for their injuries." Pub. Act 89—7, eff. March 9, 1995. There is universal agreement that the compensatory goal of tort law requires that an injured plaintiff be made whole. See, e.g., *Peterson v. Lou Bachrodt Chevrolet Co.*, 76 Ill. 2d 353, 363 (1979); 25 C.J.S. *Damages* § 17 (1966). In this case, the arbitrary and automatic cap on compensatory damages for noneconomic injuries in only certain tort cases parallels the harm of the arbitrary classifications stricken by this court in *Wright, Grace,* and *Grasse.* Therefore, the $500,000 limit does not reestablish the credibility of the tort system, and does nothing to assist the trier of fact in determining appropriate damages for noneconomic injuries. The limitation actually undermines the stated goal of providing consistency and rationality to the civil justice system.

We reject defendants' argument that the damages cap in section 2—1115.1 should be upheld because reform can be undertaken "one step at a time." As previously noted in this opinion, this court has rejected the "one step" rationale to support a classification if the classification is arbitrary. *Grace,* 51 Ill. 2d at 487. We need not address this justification further.

Defendants also argue that the legislative interest in reducing the "systemic costs of tort liability" is sufficient to overcome plaintiffs' special legislation chal-

lenge. The "systemic costs of tort liability" are not defined in Public Act 89—7 and we are uncertain as to the meaning and scope of these terms. Even if we assume that the reduction of these undefined systemic costs is a legitimate state interest, we do not discern how the limiting of noneconomic damages in personal injury actions may be considered rationally related to the achievement of that interest. See *Wright*, 63 Ill. 2d 313 (rejecting defendants' argument that lower insurance premiums and medical malpractice costs for all recipients of medical care legitimately offset the loss of compensatory damages to some malpractice victims); *Grace*, 51 Ill. 2d at 487-88 (rejecting cost-based justification for imposing limits on the recovery of personal injury claims as to certain class of plaintiffs). *Cf. Bernier*, 113 Ill. 2d 219 (punitive damages cap upheld).[4] In the instant case, we are unable to discern any connection between the automatic reduction of one type of compensatory damages awarded to one class of injured plaintiffs and a savings in the systemwide costs of litigation. Even assuming that a systemwide savings in costs were achieved by the cap, the prohibition against special legislation does not permit the entire burden of the anticipated cost savings to rest on one class of injured plaintiffs. *E.g., Grace*, 51 Ill. 2d at 485. We therefore reject defendants' systemic costs rationale as a basis for upholding section 2—1115.1.

---

[4]In *Bernier*, this court held that the elimination of punitive damages in medical malpractice cases served the legitimate legislative goal of reducing damages against the medical profession. In doing so, the court expressly stated: "That this court previously has invalidated, as special legislation, limits on recovery of compensatory damages in medical malpractice actions [citation], does not require that punitive damages be available in every case. The two are readily distinguishable; punitive damages, as their name suggests, are intended to punish rather than compensate." *Bernier*, 113 Ill. 2d at 246.

Defendants additionally argue that the General Assembly has the power to change the common law and, therefore, the limitation on compensatory damages is constitutional. See V. Schwartz, M. Behrens & M. Taylor, *Illinois Tort Law: A Rich History of Cooperation and Respect Between the Courts and the Legislature*, 28 Loy. U. Chi. L.J. 745 (1997). For example, defendants cite to the Worker's Compensation Act as an instance of the legislature's valid exercise of the police power in limiting liability of an employer for injuries sustained by an employee during the course of his or her employment. *Grand Trunk Western Ry. Co. v. Industrial Comm'n*, 291 Ill. 167 (1919).

Plaintiffs do not dispute that the legislature has the power to change the common law, and we do not question defendants' argument insofar as it stands for the general principle that the General Assembly may alter the common law and change or limit available remedies. This principle is well grounded in the jurisprudence of this state. See, *e.g.*, *Grand Trunk Western Ry. Co.*, 291 Ill. 167. However, defendants' argument assumes too much. The legislature is not free to enact changes to the common law which are not rationally related to a legitimate government interest. The General Assembly's authority to exercise its police power by altering the common law and limiting available remedies is also dependent upon the nature and scope of the particular change in the law. We hold in the case at bar that the statutory cap on compensatory damages for noneconomic losses is arbitrary.

Finally, defendants support their contention that the limitation on noneconomic damages in section 2—1115.1 is constitutional by referring to several other state court decisions which have upheld damage limitations. See *Fein v. Permanente Medical Group*, 38 Cal. 3d 137, 695 P.2d 665, 211 Cal. Rptr. 368 (1985); *Samsel v.*

*Wheeler Transport Services, Inc.*, 246 Kan. 336, 789 P.2d 541 (1990); *Murphy v. Edmonds*, 325 Md. 342, 601 A.2d 102 (1992); *Adams v. Children's Mercy Hospital*, 832 S.W.2d 898 (Mo. 1992); *Greist v. Phillips*, 322 Or. 281, 906 P.2d 789 (1995); *Robinson v. Charleston Area Medical Center, Inc.*, 186 W. Va. 720, 414 S.E.2d 877 (1991); *Johnson v. St. Vincent Hospital, Inc.*, 273 Ind. 374, 404 N.E.2d 585 (1980); *Etheridge v. Medical Center Hospitals*, 237 Va. 87, 376 S.E.2d 525 (1989); *Butler v. Flint Goodrich Hospital of Dillard University*, 607 So. 2d 517 (La. 1992); *Prendergast v. Nelson*, 199 Neb. 97, 256 N.W.2d 657 (1977); see also *Davis v. Omitowoju*, 883 F.2d 1155 (3d Cir. 1989).

However, other jurisdictions have held statutory damages caps unconstitutional. *Moore v. Mobile Infirmary Ass'n*, 592 So. 2d 156, 158 (Ala. 1991); *Morris v. Savoy*, 61 Ohio 684, 688-89, 576 N.E.2d 765, 769 (1991); *Arneson v. Olson*, 270 N.W.2d 125, 135-36 (N.D. 1978); *Lucas v. United States*, 757 S.W.2d 687, 690-92 (Tex. 1988); *Sofie v. Fibreboard Corp.*, 112 Wash. 2d 636, 771 P.2d 711 (1989). The amount of noneconomic damages caps that have been invalidated in other states varies. See, *e.g.*, *Smith v. Department of Insurance*, 507 So. 2d 1080, 1088-89 (Fla. 1987) ($450,000 cap); *Brannigan v. Usitalo*, 134 N.H. 50, 58, 587 A.2d 1232, 1236-37 (1991) ($875,000 cap).

The statutory caps on damages which have been enacted by other states vary considerably in scope and effect. Similarly, the state constitutional provisions and precedents under which these damage caps have been challenged are unique to each jurisdiction. Although the decisions from other states may be instructive in some respects, we believe that these decisions are of limited assistance in answering the specific question of whether section 2—1115.1 offends the special legislation clause of the Illinois Constitution. We hold that it does.

## C. Separation of Powers

Plaintiffs also assert that section 2—1115.1 violates the separation of powers clause (Ill. Const. 1970, art. II, § 1) by improperly delegating to the legislature the power of remitting verdicts and judgments, which is a power unique to the judiciary. See Ill. Const. 1970, art. VI, § 1 (judicial power is vested in the supreme, appellate and circuit courts). According to plaintiffs, because section 2—1115.1 limits damages for noneconomic injuries, the section violates the constitutional separation of powers doctrine by invading the province of the judiciary and imposing a "one-size-fits-all 'legislative remittitur.' " Plaintiffs argue that the cap on damages contravenes the traditional authority of the courts to assess, on a case-by-case basis, whether a jury's damages award is excessive.

Defendants disagree with plaintiffs' characterization of the operation of section 2—1115.1 as a legislative remittitur. They argue that the damages cap merely "sets an outer parameter by which wholly subjective damages are limited" and in no respect displaces traditional judicial functions.

Under our constitution, the three branches of government—legislative, executive, and judicial—are separate and one branch shall not "exercise powers properly belonging to another." Ill. Const. 1970, art. II, § 1. Although our state constitution does not define legislative, executive, and judicial power (*People v. Walker*, 119 Ill. 2d 465, 473 (1988)), in "both theory and practice, the purpose of the [separation of powers] provision is to ensure that the whole power of two or more branches of government shall not reside in the same hands." *Walker*, 119 Ill. 2d at 473; *Knuepfer v. Fawell*, 96 Ill. 2d 284, 292 (1983).

Each branch of government has its own unique sphere of authority that cannot be exercised by another branch. See, *e.g.*, *Murneigh v. Gainer*, 177 Ill. 2d 287,

312-13 (1997) (holding invalid an attempted delegation of an executive or administrative function to the judicial branch); *Wright v. Central Du Page Hospital Ass'n*, 63 Ill. 2d 313, 322 (1976) (holding invalid an attempted delegation of judicial power to nonjudicial member of medical malpractice review board); *Fields Jeep-Eagle, Inc. v. Chrysler Corp.*, 163 Ill. 2d 462, 478-79 (1994) (holding invalid attempted delegation of legislative or administrative decisionmaking to the judiciary); see also *Agran v. Checker Taxi Co.*, 412 Ill. 145, 149 (1952) ("If the power is judicial in its nature, it necessarily follows that the legislature is expressly prohibited from exercising it").

This court has often recognized that the separation of the three branches of government is not absolute and unyielding. See, *e.g.*, *Strukoff v. Strukoff*, 76 Ill. 2d 53, 58 (1979). The separation of powers clause is not contravened merely because separate spheres of governmental authority may overlap. *County of Kane v. Carlson*, 116 Ill. 2d 186, 208 (1987). However, it should be emphasized that the determination of when, and under what circumstances, a violation of the separation of powers doctrine has occurred remains with the judiciary. See, *e.g.*, *Murneigh*, 177 Ill. 2d at 303; *People v. Warren*, 173 Ill. 2d 348 (1996). In furtherance of the authority of the judiciary to carry out its constitutional obligations, the legislature is prohibited from enacting laws that unduly infringe upon the inherent powers of judges. See, *e.g.*, *In re S.G.*, 175 Ill. 2d 471, 487 (1997); *Walker*, 119 Ill. 2d at 474; *People v. Bainter*, 126 Ill. 2d 292, 303 (1989); *Agran*, 412 Ill. at 149.

For over a century it has been a traditional and inherent power of the judicial branch of government to apply the doctrine of remittitur, in appropriate and limited circumstances, to correct excessive jury verdicts. *E.g.*, *Hansen v. Boyd*, 161 U.S. 397, 412, 40 L. Ed. 746,

751, 16 S. Ct. 571, 576 (1896); *Dimick v. Schiedt*, 293 U.S. 474, 484-85, 79 L. Ed. 603, 610, 55 S. Ct. 296, 300 (1935). In *Dimick*, 293 U.S. at 486, 79 L. Ed. at 611, 55 S. Ct. at 301, the United States Supreme Court recognized that remittitur of an excessive portion of a jury verdict is a question of law for the court.

The practice of ordering a remittitur of excessive damages has long been recognized and accepted as part of Illinois law. See, *e.g.*, *Richardson v. Chapman*, 175 Ill. 2d 98, 113 (1997); *Lee v. Chicago Transit Authority*, 152 Ill. 2d 432 (1992); *Carter v. Kirk*, 256 Ill. App. 3d 938 (1993). The remittitur doctrine has been acknowledged as promoting both the administration of justice and the conclusion of litigation. See *Carter*, 256 Ill. App. 3d at 947; *McElroy v. Patton*, 130 Ill. App. 2d 872, 877 (1970). This court has stated that "[a]n award of damages will be deemed excessive if it falls outside the range of fair and reasonable compensation or results from passion or prejudice, or if it is so large that it shocks the judicial conscience." *Richardson v. Chapman*, 175 Ill. 2d 98, 113 (1997). However, a damages award will not be subject to remittitur where it "falls within the flexible range of conclusions which can reasonably be supported by the facts" because the assessment of damages is primarily an issue of fact for jury determination. *Lee*, 152 Ill. 2d at 470; see also *Barry v. Owens-Corning Fiberglas Corp.*, 282 Ill. App. 3d 199, 207 (1996) (noting that evaluations of a plaintiff's pain and suffering depend on jurors' combined wisdom and experience); *Riley v. Koneru*, 228 Ill. App. 3d 883, 887-88 (1992) (noting reluctance of courts to interfere with damages awards unless the award is the result of passion or prejudice).

The deference given to the careful deliberative process of the jury is overcome if, after examining the evidence presented at trial, the trial judge determines that the jury verdict is excessive. In such a case, "the judge

may not allow the verdict to stand but must act to correct the injustice; and the failure to do so is, itself, error." *Haid v. Tingle*, 219 Ill. App. 3d 406, 410 (1991). Under such circumstances the court has a duty to correct the excessive verdict, and may do so by ordering a remittitur of a portion of the damages, with the plaintiff's consent. As a check on excessive verdicts, therefore, the inherent power of the court to order a remittitur or, if the plaintiff does not consent, a new trial, is essential to the judicial management of trials. See *Haid*, 219 Ill. App. 3d at 412.

Case law reflects that the application of remittitur should be considered on a case-by-case basis because the evidence and circumstances supporting verdicts must be carefully examined before a jury's assessment of damages is reduced. See *Richardson v. Chapman*, 175 Ill. 2d 98 (1997) (remitting one plaintiff's $11 million award for future medical expenses by $1 million and reducing by half the other plaintiff's pain and suffering award). See also *Carter v. Kirk*, 256 Ill. App. 3d 938 (1993) (finding that trial court properly granted $20,000 remittitur where the jury's verdict was excessive because medical evidence failed to support the plaintiff's claims). In other circumstances, courts have declined to enter a remittitur, even in cases involving large awards, because the evidence supported the jury's verdicts. *Cf. Holston v. Sisters of the Third Order of St. Francis*, 165 Ill. 2d 150 (1995) (declining to reduce as excessive a $7.3 million verdict in a wrongful death and survival case); *Barry*, 282 Ill. App. 3d at 208 (declining to apply a remittitur to $12 million verdict).

In the case at bar, we conclude that section 2—1115.1 undercuts the power, and obligation, of the judiciary to reduce excessive verdicts. In our view, section 2—1115.1 functions as a "legislative remittitur." Unlike the traditional remittitur power of the judiciary, the legisla-

tive remittitur of section 2—1115.1 disregards the jury's careful deliberative process in determining damages that will fairly compensate injured plaintiffs who have proven their causes of action. The cap on damages is mandatory and operates wholly apart from the specific circumstances of a particular plaintiff's noneconomic injuries. Therefore, section 2—1115.1 unduly encroaches upon the fundamentally judicial prerogative of determining whether a jury's assessment of damages is excessive within the meaning of the law.

We additionally note that the cap provision of section 2—1115.1 forces the successful plaintiff to forgo part of his or her jury award without the plaintiff's consent, in clear violation of the well-settled principle that a trial court does not have authority to reduce a damages award by entry of a remittitur if the plaintiff objects or does not consent. See, *e.g.*, *Haid*, 219 Ill. App. 3d at 411. A plaintiff's refusal to consent to remittitur will result in the ordering of a new trial. See *McCausland v. Wonderly*, 56 Ill. 410 (1870); *Congregation of the Passion, Holy Cross Province v. Touche Ross & Co.*, 224 Ill. App. 3d 559, 588 (1991). As such, the statutory scheme unduly expands the remittitur doctrine. See P. Weiss, *Reforming Tort Reform: Is There Substance to the Seventh Amendment*, 38 Cath. U.L. Rev. 737, 757 (1989).

We find persuasive the discussion of legislative remittitur contained in an opinion of the Supreme Court of Washington, *Sofie v. Fireboard Corp.*, 112 Wash. 2d 636, 771 P.2d 711 (1989). In that case, the court found unconstitutional Washington's statutory limit on noneconomic damages. The *Sofie* court held the statutory damages cap unconstitutional on the basis that it violated the plaintiffs' right to a trial by jury, an issue we do not determine in the instant case. The court's secondary discussion, which considered the plaintiffs'

separation of powers challenge, is instructive to our separation of powers analysis.

In addressing the plaintiffs' arguments that the statutory damages cap operated as a "legislative remittitur" in violation of the separation of powers doctrine, the Washington Supreme Court observed that the statute "directly changes the outcome of a jury determination *** by taking a jury's finding of fact and altering it to conform to a predetermined formula." *Sofie*, 112 Wash. 2d at 653, 771 P.2d at 720. The court observed that remittitur is wholly within the power of the trial judge, and it is the judge who is empowered to make the legal conclusion, on a case-by-case basis, that the jury's damage award is excessive in light of the evidence. Consequently, because the "[l]egislature cannot make such case-by-case determinations," separation of powers concerns would be violated by the "legislative attempt to mandate legal conclusions." *Sofie*, 112 Wash. 2d at 654, 771 P.2d at 721. Although the *Sofie* court did not base its decision squarely upon separation of powers concerns, the court observed, "[T]he [statutory damages] limit may, indeed, violate the separation of powers." *Sofie*, 112 Wash. 2d at 654, 771 P.2d at 721.

In the case at bar, we conclude that section 2—1115.1 invades the power of the judiciary to limit excessive awards of damages. The courts are constitutionally empowered, and indeed obligated, to reduce excessive verdicts where appropriate in light of the evidence adduced in a particular case. Section 2—1115.1, however, reduces damages by operation of law, without regard to the specific circumstances of individual jury awards. Although legislative limits upon certain types of damages may be permitted, such as damages recoverable in statutory causes of action, we hold that the cap in section 2—1115.1 violates the separation of powers clause of the Illinois Constitution.

In summary, we hold that the compensatory damages cap of section 2—1115.1 violates the constitutional prohibition against special legislation and also violates the separation of powers clause. Because we have so determined, we decline to address the parties' additional arguments questioning the validity of section 2—1115.1 as violating the right to a jury trial and the right to a certain remedy under the Illinois Constitution.

III. Section 3.5 of the Joint Tortfeasor Contribution Act

Plaintiffs challenge the constitutionality of the "contribution credit" created by Public Act 89—7. This credit is set forth in a new provision, section 3.5(a), which has been added to the Joint Tortfeasor Contribution Act (740 ILCS 100/3.5(a) (West 1996)). Section 3.5(a) provides:

"§ 3.5. Contribution against the plaintiff's employer.

(a) If a tortfeasor brings an action for contribution against the plaintiff's employer, the employer's liability for contribution shall not exceed the amount of the employer's liability to the plaintiff under the Workers' Compensation Act or the Workers' Occupational Diseases Act. The tortfeasor seeking contribution from the plaintiff's employer is not entitled to recover money from the employer. The tortfeasor shall receive a credit against his or her liability to the plaintiff in an amount equal to the amount of contribution, if any, for which the employer is found to be liable to that tortfeasor, even if the amount exceeds the employer's liability under the Workers' Compensation Act or the Workers' Occupational Diseases Act." 740 ILCS 100/3.5(a) (West 1996).

The circuit court held that section 3.5(a) violated the due process and equal protection clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 2), the right to a certain remedy (Ill. Const. 1970, art. I, § 12), and the separation of powers provision (Ill. Const. 1970, art. II, § 1). The court concluded that the section would deprive an injured party of "full compensation due to [its] constitutional infirmities." The court also noted that "working mathematically through different scenarios

demonstrates that illogical and surely unintended results occur from [applying the principles of section 3.5(a)]."

Initially, we note the fundamental inconsistency between section 3.5(a) and the amendments made by Public Act 89—7 to section 2—1117 of the Code of Civil Procedure (735 ILCS 5/2—1117 (West 1996)). The amended version of section 2—1117 abolishes the doctrine of joint and several liability in all actions brought on account of death, bodily injury to person, or physical damage to property. The doctrine of joint and several liability is replaced in these actions with proportionate several liability, whereby a defendant is liable "only for that proportion of recoverable economic and non-economic damages, if any, that the amount of that defendant's fault, if any, bears to the aggregate amount of fault of all other tortfeasors." 735 ILCS 5/2—1117 (West 1996).[5] At the same time, however, section 2(b) of the Contribution Act, which is unaltered by Public Act 89—7,

---

[5]"Fault" is defined in section 2—1116 as "any act or omission that (i) is negligent, willful and wanton, or reckless, is a breach of an express or implied warranty, gives rise to strict liability in tort, or gives rise to liability under the provisions of any State statute, rule, or local ordinance and (ii) is a proximate cause of death, bodily injury to person, or physical damage to property for which recovery is sought." 735 ILCS 5/2—1116(b) (West 1996). "Contributory fault" is any fault which may be attributed to the plaintiff. 735 ILCS 5/2—1116(b) (West 1996). For purposes of our discussion regarding the apportionment of liability under section 3.5(a), we adhere to these definitions of fault and contributory fault. But see R. Wright, *Allocating Liability Among Multiple Responsible Causes: A Principled Defense of Joint and Several Liability for Actual Harm and Risk Exposure*, 21 U.C. Davis L. Rev. 1141, 1143-46 (1988) (arguing that the appropriate terminology to use when discussing the apportionment of liability is "comparative responsibility"); see also L. Pressler & K. Schieffer, *Joint and Several Liability: A Case for Reform*, 64 Denv. U.L. Rev. 650, 665 n.79 (1988).

provides that "[t]he right of contribution exists only in favor of a tortfeasor who has paid more than his pro rata share of the common liability." 740 ILCS 100/2(b) (West 1996). Thus, because a tortfeasor is only liable for his or her proportionate share of damages as defined by section 2—1117, it appears that a tortfeasor would never need, or be able, to pursue a contribution action against an employer and, therefore, that section 3.5(a) could never be given effect. See R. Michael, *Joint Liability: Should It Be Reformed or Abolished?—The Illinois Experience*, 27 Loy. U. Chi. L.J. 867, 910 (1996); S. O'Neil, *A New Day, The Civil Justice Reform Amendments of 1995*, 9 CBA Rec. at 18, 28 (May 1995) ("Contribution claims against employers are now technically unnecessary because a defendant's liability is limited to his own percentage of fault"); see also N.M. Stat. Ann. § 41—3A—1(E) (Michie 1996) (expressly noting that defendants who are subject to proportionate several liability are not entitled to contribution); Ind. Code Ann. § 34—4—33—7 (Michie 1986).

The legislature's enactment of section 3.5(a) and simultaneous adoption of proportionate several liability in section 2—1117 raises a serious question as to whether, on the basis of this conflict alone, the section 3.5(a) credit must be stricken. We need not resolve this issue, however, for even if we assume that the two provisions can coexist, we determine that section 3.5(a) is invalid.

The first sentence of section 3.5(a) states that an employer's "liability for contribution" is limited to the amount of the employer's liability to the plaintiff under the Workers' Compensation Act (820 ILCS 305/1 *et seq.* (West 1996)), or the Workers' Occupational Diseases Act (820 ILCS 310/1 *et seq.* (West 1996)). Standing alone, this sentence would be a codification of this court's decision in *Kotecki v. Cyclops Welding Corp.*, 146 Ill. 2d 155

(1991). However, the next two sentences of section 3.5(a) negate the meaning of the first sentence. The second sentence of section 3.5(a) states that a tortfeasor seeking contribution from an employer may not receive money from that employer. The third sentence then begins by stating that the tortfeasor, instead of receiving money, will receive a credit for the "amount of contribution" for which the employer is "found to be liable" to the tortfeasor. This credit is to be applied against the tortfeasor's liability to the plaintiff.

Because the first sentence of section 3.5(a) limits the employer's "liability for contribution" to the employer's workers' compensation liability, one might reasonably assume that the amount of the credit in the third sentence, which is defined as being equal to the "amount of contribution" for which the employer is "found to be liable," would also be equal to the employer's workers' compensation liability. However, this is not the case. The final clause of the third sentence unequivocally states that the amount of the credit may *exceed* the employer's workers' compensation liability. Thus, section 3.5(a) is not only inconsistent with section 2—1117, it is also internally inconsistent: if the second and third sentences of section 3.5(a) are given effect, the first sentence is rendered meaningless.

The internal contradiction within section 3.5(a) further suggests that a consistent and intelligible construction of the provision may not be possible. Again, however, we need not decide whether the section 3.5(a) credit must be invalidated on this basis alone. Even if the second and third sentences of section 3.5(a) are enforced to the exclusion of the first sentence, the credit remains invalid.

Plaintiffs contend that if the section 3.5(a) credit is given effect, then an employee's recovery from a third-party tortfeasor will be unjustifiably subjected to a

"double reduction." Plaintiffs maintain that this double reduction will occur because of the combined effect of the section 3.5(a) credit and the proportionate several liability of section 2—1117. According to plaintiffs, the employee's recovery from the third-party tortfeasor would first be reduced by the percentage of the employer's comparative fault because section 2—1117 makes the defendant only severally liable. Then, because the section 3.5(a) credit may exceed the employer's workers' compensation liability, the employee's recovery would be reduced again by the percentage of the employer's fault. Thus, plaintiffs argue that in an action by an employee against a third-party tortfeasor, the employee will bear the burden of his employer's fault twice. See 27 Loy. U. Chi. L.J. at 912.

As an illustration of how the double reduction would occur in practice, plaintiffs offer the following examples. Consider an action involving an employee plaintiff, an employer, and a third-party tortfeasor. Assume that the plaintiff is awarded $500,000 in damages and that the tortfeasor and the employer are each 50% at fault. Pursuant to the amended version of section 2—1117, the tortfeasor would be liable only for his or her proportionate share of the damages, or $250,000. Then, under section 3.5(a), the tortfeasor would obtain a credit against his or her liability to the plaintiff in an amount equal to the employer's proportionate share of the damages, in this case, 50% or $250,000. Thus, because $250,000 minus $250,000 equals zero, the tortfeasor would incur no liability to the plaintiff.

A similar situation occurs when the contributory fault of the plaintiff and the employer's fault together equals 50% or more. Assume the same verdict of $500,000. Further assume that the plaintiff's percentage of contributory fault is 10%, the tortfeasor's percentage of fault is 50%, and the employer's percentage of fault

is 40%. The $500,000 verdict would first be reduced by the plaintiff's degree of contributory fault. This reduction would be 10% of $500,000, or $50,000. The tortfeasor is liable for 50% of the verdict, or $250,000, but then gets a credit for the amount of liability allocated to the employer (in this example, 40%, or $200,000). Thus, the tortfeasor, whose percentage of fault is 50%, is liable for only $50,000, or 10% of the total damages.

Plaintiffs argue that in both of the examples above, the employee's recovery from the third-party tortfeasor is subjected to a double reduction. Plaintiffs maintain that this double reduction is arbitrary and discriminatory, and in violation of principles of due process and equal protection.

Defendants do not contend that the double reduction effect is constitutional. Instead, defendants assert that the section 3.5(a) credit should be construed in a limited fashion so that the double reduction will not occur. Specifically, defendants maintain that the section 3.5(a) credit should be available only in those situations where the third-party tortfeasor settles with the plaintiff for an amount greater than his or her proportionate share of liability. In these situations, according to defendants, the proportionate several liability of section 2—1117 would not apply. Thus, the application of the section 3.5(a) credit to the settlement amount would not produce a double reduction.

We do not believe that this construction of section 3.5(a) is permitted by the statute. Under section 3.5(a), a third-party tortfeasor seeking contribution from an employer may not receive money. Instead, the tortfeasor receives a credit which is applied against the tortfeasor's "liability to the plaintiff." However, once the tortfeasor settles with the plaintiff, the tortfeasor is no longer liable for the plaintiff's damages. Thus, if the tortfeasor settles, there is no liability to which the credit

can be applied. Therefore, under the plain language of the statute, section 3.5(a) cannot apply to those situations where the third-party tortfeasor settles with the plaintiff. See also 27 Loy. U. Chi. L.J. at 910 n.257.

Defendants also assert that, as a practical matter, the double reduction will never occur. They point out that under section 2—1117, a tortfeasor will never be liable for more than his or her proportionate share of the damages and, therefore, will never meet the threshold requirement for contribution. See 740 ILCS 100/2(b) (West 1992). According to defendants, the double reduction effect described by plaintiffs is merely a hypothetical event which will not happen in practice.

Defendants are correct to point out that, logically, the section 3.5(a) credit cannot exist in the face of the proportionate several liability of section 2—1117, but this fact only serves to highlight the conflict between the two provisions. Furthermore, while defendants' argument that the section 3.5(a) credit will never occur resolves the conflict with section 2—1117 and the internal contradiction within section 3.5(a), it also renders the second and third sentences of section 3.5(a) a complete nullity, in violation of well-established principles of statutory construction. See, *e.g.*, *Kraft, Inc. v. Edgar*, 138 Ill. 2d 178, 189 (1990) ("A statute should be construed so that no word or phrase is rendered superfluous or meaningless"); 2A N. Singer, Sutherland on Statutory Construction § 46.06 (5th ed. 1993).[6]

Section 3.5(a) was discussed only briefly during the

---

[6]In the circuit court, defendants contended that the section 3.5(a) credit could be saved by construing it so that "multiple tortfeasors [would receive] a cumulative total credit for the employer's liability assessment." See also S. Miller, *Contribution Claims Under the New Act*, 6 IDC Quarterly ii, iv (First Quarter 1996) (suggesting that the section 3.5(a) be construed so that "the employer's share of fault [is] deducted from the total damages rather than from each individual's share"). However, the tortfea-

debate on House Bill 20 and the comments which were offered provide no guidance in resolving the ambiguities of the provision. See 89th Ill. Gen. Assem., House Proceedings, February 16, 1995, at 53-57, 129-30. Accordingly, we conclude that the credit set forth in the second and third sentences of section 3.5(a) is either arbitrary and unconstitutional, as plaintiffs propose, or entirely superfluous, as defendants propose. In either case, the section 3.5(a) credit is invalid and must be stricken.

IV. The Abolition of Joint and Several Liability

The common law doctrine of joint and several liability provides, in general, that when two or more defendants tortiously contribute to the same, indivisible injury, each defendant may be held jointly and severally liable for the entire injury. See generally 3 F. Harper, F. James & O. Gray, Torts §§ 10.1, 10.2 (2d ed. 1986); W. Keeton, Prosser & Keeton on Torts §§ 47, 50 through 52 (5th ed. 1984); *Coney v. J.L.G. Industries, Inc.*, 97 Ill. 2d 104, 119-20 (1983). Significantly, under this doctrine, the plaintiff may recover compensation for the full amount of the injury from any one of defendants responsible for the injury. *Coney*, 97 Ill. 2d at 119-20.

As noted previously, Public Act 89—7 eliminates the doctrine of joint and several liability in all actions brought on account of death, bodily injury to person, or physical damage to property. In amendments made to section 2—1117 of the Code of Civil Procedure, Public Act 89—7 replaces joint and several liability with proportionate several liability. The amended version of section 2—1117 provides in full:

---

sors already receive a "cumulative total credit for the employer's liability" under section 2—1117. Thus, this argument does nothing to eliminate the double reduction which occurs when the section 3.5(a) credit is given effect.

"§ 2—1117. Several liability.

(a) In any action brought on account of death, bodily injury to person, or physical damage to property in which recovery is predicated upon fault as defined in Section 2—1116, a defendant is severally liable only and is liable only for that proportion of recoverable economic and non-economic damages, if any, that the amount of that defendant's fault, if any, bears to the aggregate amount of fault of all other tortfeasors, as defined in Section 2—1116, whose fault was a proximate cause of the death, bodily injury, economic loss, or physical damage to property for which recovery is sought.

(b) Notwithstanding the provisions of subsection (a), in any healing art malpractice action based on negligence or wrongful death, any defendants found liable shall be jointly and severally liable if the limitations on non-economic damages in Section 2—1115.1 of this Act are for any reason deemed or found to be invalid." 735 ILCS 5/2—1117 (West 1996).

The circuit court concluded that, with "absolute certainty," section 2—1117 deprives the citizens of Illinois of their right to "find a certain remedy in the laws for all injuries and wrongs" (Ill. Const. 1970, art. I, § 12). The court further determined that section 2—1117 " 'unreasonably mandates an allocation of percentages of negligence to nonparties without any kind of procedural safeguard' " (quoting *Newville v. State of Montana Department of Family Services*, 267 Mont. 237, 252, 883 P.2d 793, 802-03 (1994)) and, hence, violates the constitutional right to due process (Ill. Const. 1970, art. I, § 2). The circuit court also held that section 2—1117 violates the separation of powers provision of the Illinois Constitution (Ill. Const. 1970, art. II, § 1) and the courts provision (Ill. Const. 1970, art. VI, § 1).

In part III of this opinion, we noted that section 2—1117 is fundamentally at odds with the basic principles of the Contribution Act and with section 3.5(a). Section 2—1117 also directly conflicts with section 4 of the Contribution Act (740 ILCS 100/4 (West 1996)). Pub-

lic Act 89—7 amended section 4 by adding the words "[e]xcept as provided in Section 3.5 of this Act." Pub. Act 89—7, eff. March 9, 1995. Section 4 now provides:

"§ 4. Rights of Plaintiff Unaffected. Except as provided in Section 3.5 of this Act, a plaintiff's right to recover the full amount of his judgment from any one or more defendants subject to liability in tort for the same injury to person or property, or for wrongful death, is not affected by the provisions of this Act." 740 ILCS 100/4 (West 1996).

Section 4 evidently retains the doctrine of joint and several liability because it expressly preserves a plaintiff's right to obtain a full recovery of damages from any one or more defendants, subject only to section 3.5. See *Coney*, 97 Ill. 2d at 123. Yet, at the same time, section 2—1117 unquestionably abolishes joint and several liability. See 27 Loy. U. Chi. L.J. at 910 n.258. The simultaneous adoption and retention of two substantive, contradictory doctrines in a single act creates a significant obstacle to discerning the legislative intent behind Public Act 89—7. Because section 2—1117 and section 4 of the Contribution Act are diametrically opposed, any attempt to harmonize them would necessarily be futile. Moreover, we cannot assume that the retention of section 4 was merely an oversight by the legislature because the section itself was amended by Public Act 89—7. Hence, the legislature was mindful of both section 2—1117 and section 4 at the time Public Act 89—7 was passed and was presumptively aware of their meanings.

As with the section 3.5(a) credit, the irreconcilable conflict between section 2—1117 and section 4 raises a serious question as to whether section 2—1117 can be enforced without substantially, and improperly, rewriting Public Act 89—7. See, *e.g.*, *Kozak v. Retirement Board of the Firemen's Annuity & Benefit Fund*, 95 Ill. 2d 211, 220 (1983) (statute may not be rewritten to make

it consistent with the court's view of sound public policy). However, we need not resolve this issue. Like the section 3.5(a) credit, we believe that even if section 2—1117 can be considered in isolation, it is invalid.

Defendants contend that the legislature's adoption of proportionate several liability in section 2—1117 is a reasonable legislative action, in light of problems which allegedly exist with the doctrine of joint and several liability. According to defendants, the foremost problem with joint and several liability is that it unfairly holds tortfeasors liable for damages which they do not cause.[7] In an argument dependent upon this assertion, defendants also maintain that, under joint and several liability, "deep pocket" defendants are improperly forced to bear the costs of misconduct caused by others. Defendants assert that these costs, which are initially

---

[7]The proponents of the amended version of section 2—1117 have uniformly asserted that, under the doctrine of joint and several liability, tortfeasors are held liable for damages which they do not cause. See, *e.g.*, 89th Ill. Gen. Assem., House Proceedings, February 16, 1995, at 17 (statements of Representative Cross) ("[Section 2—1117] would abolish the doctrine of joint and several liability to hold people who are responsible for other's damages responsible for only their share of the losses and not for the losses which they did not cause"); K. Dillard, *Illinois' Landmark Tort Reform: The Sponsor's Policy Explanation*, 27 Loy. U. Chi. L.J. 805, 813 (1996) ("[T]he system [of joint and several liability] unfairly forced defendants to pay more than the damages which they caused"); M. Redish, *The Constitutionality of Illinois Tort Reform III—The Repeal of Joint and Several Liability*, IDC Quarterly, at 5, 10 (Second Quarter 1996) ("In repealing joint-and-several liability, the General Assembly decided that fundamental notions of morality dictate the conclusion that defendants should not be obligated to pay for harm which they did not cause"); S. O'Neil, *A New Day, The Civil Justice Reform Amendments of 1995*, 9 CBA Rec. 18, 20 (May 1995) ("Although it may seem unjust to leave a plaintiff uncompensated for the entire loss, it may be equally unfair to require a defendant who caused a small portion of those damages to pay them in their entirety").

borne by the "deep pocket" defendant, are eventually passed on to others in the form of higher consumer costs and increased taxes. See also IDC Quarterly, at 7 (Second Quarter 1996) (contending that joint and several liability inherently gives rise to economic inefficiency and that the doctrine creates a "skewing of economic incentives"). Defendants maintain that these failings of joint and several liability are cured, either partially or fully, by proportionate several liability. Therefore, according to defendants, the legislature was justified in enacting section 2—1117.

We note that the proposition which defendants offer as the primary explanation for abolishing the doctrine of joint and several liability, *i.e.*, the assertion that the doctrine requires tortfeasors to pay for more damages than they caused, is at odds with this court's explanation of joint and several liability in *Coney*, 97 Ill. 2d 104. In *Coney*, this court was asked to decide, *inter alia*, whether the doctrine of comparative negligence or fault necessitated the elimination of joint and several liability. *Coney*, 97 Ill. 2d at 110. The defendant in *Coney* urged this court to abandon joint and several liability, arguing that "[w]ith the adoption of comparative negligence where damages are apportioned according to each party's fault, *** it is no longer rational to hold a defendant liable beyond his share of the total damages." *Coney*, 97 Ill. 2d at 120. The court rejected this argument and held that the adoption of comparative negligence did not mandate the abolition of joint and several liability. In so holding, the *Coney* court stated:

"The feasibility of apportioning fault on a comparative basis does not render an indivisible injury 'divisible' for purposes of the joint and several liability rule. *A concurrent tortfeasor is liable for the whole of an indivisible injury when his negligence is a proximate cause of that damage.* *** The mere fact that it may be possible to assign some percentage figure to the relative culpability of

one negligent defendant as compared to another *does not in any way suggest that each defendant's negligence is not a proximate cause of the entire indivisible injury.*" (Emphasis added.) *Coney,* 97 Ill. 2d at 121-22.

See also *Burke v. 12 Rothschild's Liquor Mart, Inc.,* 148 Ill. 2d 429, 452-53 (1992) (recognizing that the adoption of comparative negligence principles does not alter a joint tortfeasor's full responsibility for a plaintiff's single, indivisible injury).

The principle that tortfeasors who are held jointly and severally liable are each fully responsible for the entirety of the plaintiff's injury has been explained:

"Joint and several liability only applies to injuries for which the defendant herself is fully responsible. She is responsible for the entirety of some injury *only if her tortious behavior was an actual and proximate cause of the entire injury.* [Emphasis added.] She is not liable for injuries, including separable portions of injuries, to which she did not contribute. She is not liable unless the tortious aspect of her conduct was an actual cause of the injury. Moreover, even then, she is not liable if, for reasons of policy or principle, her connection to the injury is considered too remote or minimal to be 'proximate.'

A defendant's individual full responsibility for an injury that was an actual and proximate result of her tortious behavior is not diminished if some other person's tortious behavior also was an actual and proximate cause of the injury. Rather each defendant whose tortious behavior was an actual and proximate cause of the injury is individually fully responsible for the entire injury. This is most obvious when a defendant's tortious behavior was either necessary or independently sufficient for the occurrence of the injury, but it remains true whenever a defendant's tortious behavior was an actual and proximate cause of the injury.

\* \* \*

[There is a fundamental difference] between each [joint] defendant's *individual full responsibility* for the damages that she tortiously caused and the *comparative responsibility percentage*s that are obtained by comparing the

defendants' individual full responsibilities for the injury. [In situations where two defendants are held jointly and severally liable for negligently injuring a plaintiff] [n]either defendant *** [is] merely '50% negligent' or '50% responsible.' Such statements make as much sense as saying that someone is '50% pregnant.' Nor did either defendant's negligence cause or occasion only 50% of the plaintiff's injury. Rather, each defendant was 100% negligent, each defendant's negligence was an actual and proximate cause of 100% of the injury, and each defendant therefore is fully responsible for the entire injury. Only when we *compare* their individual full responsibilities, and assume that they were equally negligent, does it make sense to say that each defendant, *when compared to the other*, bears 50% of the total *comparative* responsibility for the injury." (Emphasis in original.) R. Wright, *The Logic and Fairness of Joint and Several Liability*, 23 Memphis St. U.L. Rev. 45, 54-56 (1992).

See also Restatement (Second) of Torts § 875, Comment *c*, at 315 (1979) (under the rules of causation set forth by the Restatement, "any one of a number of persons whose tortious conduct is a substantial factor in causing harm is liable for the harm in the absence of a superseding cause"); *Lilly v. Marcal Rope & Rigging, Inc.*, 289 Ill. App. 3d 1105, 1113-16 (1997); 27 Loy. U. Chi. L.J. at 907-08; 21 U.C. Davis L. Rev. at 1141-93.

This court's reasoning in *Coney* places into question defendants' primary justification for abolishing joint and several liability, *i.e.*, that the doctrine requires some defendants to pay for more damages than they caused or for which they are responsible. We need not resolve, however, the conflict between the *Coney* court's analysis of joint and several liability and defendants' justification for abolishing the doctrine. We believe that, because of the way in which it is drafted, section 2—1117 violates the special legislation clause of the Illinois Constitution.

Section 2—1117 purports to eliminate the doctrine of joint and several liability. However, it does not do so completely. Paragraph (b) of section 2—1117 automati-

cally reinstates joint and several liability for medical malpractice defendants if the cap on noneconomic damages in section 2—1115.1 is invalidated. Because we have held that the cap on noneconomic damages is unconstitutional, section 2—1117(b) has been activated.

The justification for imposing joint and several liability upon medical malpractice defendants in the absence of a damages cap is not immediately apparent. See J. Zimmerman, P. Phillips & J. Bisceglia, *A Review of the Illinois Civil Justice Reform Act of 1995*, 83 Ill. B.J. 282, 285 (1995) ("Neither the statutory language preserving joint and several liability in these narrow circumstances nor the legislative purpose for doing so are clear"). One reason for enacting section 2—1117(b) which was given during the debate on House Bill 20 was that section 2—1117(b) was needed to achieve fairness for plaintiffs bringing medical malpractice actions. Representative Cross, in response to a question asking whether section 2—1117(b) was intended as an exclusive benefit for the medical profession, explained that the legislature was "trying to be fair to people that have services of ... from [physicians], from nurses, from hospitals, anyone associated with the health care industry." 89th Ill. Gen. Assem., House Proceedings, February 16, 1995, at 150 (statements of Representative Cross).

The differences between proportionate several liability and joint and several liability can have a significant, practical impact upon tort plaintiffs. As one commentator has explained:

"If all the tortfeasors are available and solvent, joint and several liability with contribution and proportionate several liability both ultimately achieve the same result: liability is apportioned among the multiple responsible causes according [to] their comparative responsibility. However, two major practical differences exist between joint and several liability and proportionate several li-

ability. Under proportionate several liability, the plaintiff can recover full compensation for his injury only if he locates, sues, and collects from each party who tortiously contributed to his injury. The plaintiff therefore bears a substantial risk of receiving less than full compensation if any tortfeasor is missing, insolvent, or has an expected share of liability that would not be worth the cost of litigation. In addition, the costs in time and dollars of the multiple actions required to obtain theoretically full compensation will substantially delay and reduce the plaintiff's actual net compensation even if all the tortfeasors can be sued successfully. Conversely, under joint and several liability the risk of insolvent or otherwise unavailable tortfeasors and the expense of multiple actions is placed on the solvent tortfeasors, if any, from whom the plaintiff initially obtains compensation. The plaintiff can obtain full compensation in the initial suit, and the tortfeasors who pay the plaintiff must seek contribution or indemnity from the other tortfeasors." U.C. Davis L. Rev. at 1142-43.

See also *Coney,* 97 Ill. 2d at 123-24.

Section 2—1117(b)'s abatement of proportionate several liability in the context of medical malpractice arbitrarily benefits only medical malpractice plaintiffs. These plaintiffs will not have to bring several separate actions to recover full compensation for their injuries. Nor will these plaintiffs bear the risk of any tortfeasor being insolvent or otherwise unavailable. However, other tort plaintiffs, whose injuries are not caused by medical malpractice, will face these burdens. Neither the plaintiffs nor the defendants in the case at bar have offered any explanation as to why a select group of medical malpractice plaintiffs should enjoy the practical benefits of joint and several liability to the exclusion of all other tort plaintiffs. The legislature, of course, may reasonably and justifiably be concerned with achieving fairness for tort plaintiffs. But the legislature may not adopt an arbitrary means of achieving that goal. *Grace,* 51 Ill. 2d at 485. If, in fact, a real need exists to elimi-

nate the harshness of several liability, then logically this need exists for all plaintiffs who have suffered physical injury or loss of property at the hands of joint tortfeasors, and not just medical malpractice plaintiffs. The stated legislative goal of achieving fairness does not justify singling out a select group of tort plaintiffs for special treatment. Therefore, we conclude that section 2—1117(b) arbitrarily and unconstitutionally provides a special benefit for medical malpractice plaintiffs. See generally *Grasse*, 412 Ill. 179.

We further note that section 2—1117(b) contradicts the stated purpose for enacting proportionate several liability. The preamble to Public Act 89—7 declares that "it is the public policy of this State that a defendant should not be liable for damages in excess of its proportional share of fault." Plaintiffs and defendants both agree that this policy was the basis for the adoption of proportionate several liability in section 2—1117(a).[8] Section 2—1117(b) inexplicably contradicts this rationale. If the premise underlying Public Act 89—7's abolition of joint and several liability is that the doctrine unfairly permits a plaintiff to recover more in damages than is justified from an individual defendant then, logically, that unfairness is only exacerbated if there is no cap on the total amount of the damages which the plaintiff can recover. Thus, the invalidation of the cap on noneconomic damages does not justify or explain the exemption provided by section 2—1117(b) from the general rule of several liability.

In sum, there is no discernable rational basis for treating medical malpractice plaintiffs differently from other plaintiffs in death, bodily injury and property damage cases. Moreover, treating these plaintiffs differ-

---

[8]Before the circuit court, defendants contended that the "only" means by which the legislature could give effect to this policy was to adopt proportionate several liability.

ently in the absence of a damages cap is directly contrary to the legislature's acknowledged purpose for enacting proportionate several liability. The proscription against special legislation prevents the legislature from preferentially and arbitrarily discriminating in favor of a select group. *Village of Vernon Hills*, 168 Ill. 2d at 122. Accordingly, we conclude that section 2—1117(b) violates the special legislation clause of the Illinois Constitution.

Plaintiffs contend that section 2—1117(b) cannot be severed from section 2—1117(a) and, therefore, that if section 2—1117(b) is invalid then all of section 2—1117 must be stricken. For the reasons stated more fully in part VI of this opinion, we agree that without section 2—1117(b), the remainder of section 2—1117 no longer reflects the legislature's intentions regarding the scope and nature of its enactment of proportionate several liability. See, *e.g.*, *Lee v. Retirement Board of the Policeman's Annuity & Benefit Fund*, 31 Ill. 2d 252 (1964). Therefore, we hold that section 2—1117(b) cannot be severed from section 2—1117(a) and that the entirety of section 2—1117 is unconstitutional.

### V. Constitutionality of the Physician-Patient Disclosure Rules

We next consider the constitutionality of certain provisions of Public Act 89—7 that significantly alter existing discovery practice in Illinois. Section 2—1003(a) of the Act imposes a mandatory consent requirement by which every patient who files a personal injury lawsuit is deemed to agree to the unlimited disclosure of his or her medical history, records, and other medical information to any party who has appeared in the action and who requests such information. 735 ILCS 5/2—1003(a) (West 1996). Section 2—1003, which is entitled "Discovery and depositions" sets forth the disclosure require-

ments in detail.[9] If the plaintiff fails to supply the requested consent form within 28 days, the court is required, upon motion of a defendant, to compel the plaintiff's compliance or to issue an order of involuntary dismissal of the plaintiff's action. The mandatory consent of section 2—1003 operates as a waiver of any privilege between the injured person and each health care provider who has furnished care at any time. The consent or waiver extends to *ex parte* conferences between the plaintiff's treating physicians or other health care personnel and the defendant and his or her representatives. As such, section 2—1003(a) is directly contrary to what has been referred to as the "*Petrillo* doctrine," which prohibits defendants and their attorneys from engaging in *ex parte* discussions with the injured plaintiff's treating physicians. *Petrillo v. Syntex Laboratories, Inc.*, 148 Ill. App. 3d 581 (1986).

We note that the prior version of section 2—1003 consisted of five paragraphs, the first of which provided in its entirety: "Discovery, admissions of fact and of genuineness of documents and answers to interrogatories shall be in accordance with rules." 735 ILCS 5/2—1003(a) (West 1992). This provision has been retained as subsection (a—1) of the amended statute and the remaining provisions of the prior statute have also been retained. Public Act 89—7 adds a new subsection to the

---

[9]These requirements are expressly incorporated into several other amendments to the Code of Civil Procedure as well: section 8—802 (privilege between healthcare practitioner and patient), section 8—2001 (inspection of hospital records), section 8—2003 (physician's and other healthcare practitioner's records) and section 8—2004 (records of clinical psychologists and clinical social workers). 735 ILCS 5/2—1003, 8—802, 8—2001, 8—2003, 8—2004 (West Supp. 1995). Because the challenged medical disclosure requirements originate in section 2—1003(a), our discussion hereafter will focus on that section.

discovery and depositions statute, which provides in its entirety:

"(a) Any party who by pleading alleges any claim for bodily injury or disease, including mental health injury or disease, shall be deemed to waive any privilege between the injured person and each health care provider who has furnished care at any time to the injured person. 'Health care provider' means any person or entity who delivers or has delivered health care services, including diagnostic services, and includes, but is not limited to, physicians, psychologists, chiropractors, nurses, mental health workers, therapists, and other healing art practitioners. Any party alleging any such claim for bodily or mental health injury or disease shall, upon written request of any other party who has appeared in the action, sign and deliver within 28 days to the requesting party a separate Consent authorizing each person or entity who has provided health care at any time to the allegedly injured person to:

(1) furnish the requesting party or the party's attorney a complete copy of the chart or record of health care in the possession of the provider, including reports sent to any third party, including any records generated by other health care providers and in the possession of the health care provider, and including radiographic films of any type;

(2) permit the requesting party or the party's attorney to inspect the original chart or record of health care during regular business hours and at the regular business location of the health care provider, upon written request made not less than 7 days prior to the inspection;

(3) accept and consider charts and other records of health care by others, radiographic films, and documents, including reports, deposition transcripts, and letters, furnished to the health care provider by the requesting party or the party's attorney, before giving testimony in any deposition or trial or other hearing;

(4) confer with the requesting party's attorney before giving testimony in any deposition or trial

or other hearing and engage in discussion with the attorney on the subjects of the health care provider's observations related to the allegedly injured party's health, including the following: the patient history, whether charted or otherwise recorded or not; the health care provider's opinions related to the patient's state of health, prognosis, etiology, or cause of the patient's state of health at any time, and the nature and quality of care by other health care providers, including whether any standard of care was or was not breached; and the testimony the health care provider would give in response to any point of interrogation, and the education, experience, and qualifications of the health care provider.

The form of the Consent furnished pursuant to this subsection (a) shall recite that it is signed and delivered under the authority of this subsection. Any variation in the form of the Consent required by any health care provider, not subject to the jurisdiction of the circuit court before which the action is pending, to whom a request is directed under subdivision (1) or (2) of this subsection (a) shall be accepted by the allegedly injured party and the revised form requested by the health care provider shall be signed and delivered to the requesting party within 28 days after it is tendered for signature.

All documents and information obtained pursuant to a Consent shall be considered confidential. Disclosure may be made only to the parties to the action, their attorneys, their insurers' representatives, and witnesses and consultants whose testimony concerns medical treatment prognosis, or rehabilitation, including expert witnesses.

A request for a Consent under this subsection (a) does not preclude such subsequent requests as may reasonably be made seeking to expand the scope of an earlier Consent which was limited to less than all the authority permitted by subdivisions (1) through (4) of this subsection (a) or seeking additional Consents for other health care providers.

The provisions of this subsection (a) do not restrict the right of any party to discovery pursuant to rule.

Should a plaintiff refuse to timely comply with a request for signature and delivery of a consent permitted by this subsection (a) the court, on motion, shall issue an order authorizing disclosure to the party or parties requesting said consent of all records and information mentioned herein or order the cause dismissed pursuant to Section 2—619(a)(9)." 735 ILCS 5/2—1003(a) (West 1996).

In the case at bar, plaintiffs challenged the medical disclosure requirements in the circuit court on several grounds, arguing that section 2—1003(a) violates separation of powers, the right to privacy, the right to certain remedy and access to the courts, and the prohibition against special legislation. The circuit court ruled that section 2—1003(a) and the corollary provisions of Public Act 89—7 unduly encroach on the authority of the judiciary and conflict with present supreme court rules. The court also held that the provisions violate the "fundamental right to privacy and access to the courts enjoyed by the citizens of this state," and that there was not "a rational basis for requiring a citizen to reveal medical conditions unrelated to the litigation in which she is engaged." The circuit court further observed that mandating plaintiffs' consent to unlimited disclosure of confidential medical information unrelated to the injury on which the lawsuit was brought would "likely force many persons to avoid the courthouse to redress their wrongs." The circuit court specifically upheld "*Petrillo* [as] well-reasoned law which protects the rights outlined above" and concluded that the "usual discovery procedures and the Supreme Court rules together" provide defendants with adequate opportunity to test plaintiffs' allegations.

This court has declared section 2—1003(a) unconstitutional in *Kunkel v. Walton*, 179 Ill. 2d 519 (1997), a case which, we note, was under advisement at the same time as the case at bar. The parties incorporate by ref-

erence the arguments made in *Kunkel*, which include several *amici curiae* briefs filed on behalf of defendants. We have reviewed all of the briefs filed in this court which relate to the constitutionality of section 2—1003(a). Of the various constitutional challenges made to this provision, we resolve its constitutionality primarily upon the separation of powers doctrine. We also consider plaintiffs' argument that the Illinois Constitution of 1970 grants a privacy interest to the citizens of this state and, as part of that analysis, we examine the reasoning of the appellate court in *Petrillo*.

### A. Separation of Powers

As we have noted elsewhere in this opinion, the separation of powers clause of the Illinois Constitution provides that each branch of government is separate and may not exercise the powers of another branch. Ill. Const. 1970, art. II, § 1; *People v. Warren*, 173 Ill. 2d 348 (1996); *Murneigh v. Gainer*, 177 Ill. 2d 287. The judicial power is vested in the supreme court, the appellate court, and the circuit courts. Ill. Const. 1970, art. VI, § 1. In addition, the judicial article of the constitution vests this court with supervisory and rulemaking authority over the judicial system of Illinois. See Ill. Const. 1970, art. VI, § 16. It is the constitutional duty of this court to preserve the integrity and independence of the judiciary and to protect the judicial power from encroachment by the other branches of government. *People v. Davis*, 93 Ill. 2d 155, 161 (1982). See also *People v. Joseph*, 113 Ill. 2d 36 (1986); *People v. Flores*, 104 Ill. 2d 40, 49 (1984).

In the case at bar, plaintiffs maintain that section 2—1003(a) violates the separation of powers clause because the statute abrogates the judiciary's inherent authority to restrict discovery to relevant information and to provide appropriate sanctions for discovery abuses. Specifically, section 2—1003(a) provides that the

circuit court "*shall* issue an order authorizing disclosure to the party or parties requesting said consent of all records and information mentioned herein *or* order the cause dismissed pursuant to Section 2—619(a)(9)." (Emphasis added.) 735 ILCS 5/2—1003(a) (West 1996). Plaintiffs contend that this mandatory directive upon the circuit courts unduly infringes upon the powers of the judiciary because it not only undercuts the inherent authority of the courts in the exercise of judicial functions but also directly conflicts with certain discovery rules of this court.

Defendants maintain that the challenged provision serves the important societal function of expediting discovery and curtailing potential abuses of the discovery process by unscrupulous plaintiffs or attorneys who do not disclose all facts necessary for defendants to prepare a defense. Defendants further observe that this court has often recognized the legislature's power to regulate practice and procedure. See, *e.g.*, *People v. Walker*, 119 Ill. 2d 465 (1988); *DeLuna v. St. Elizabeth's Hospital*, 147 Ill. 2d 57 (1992). According to defendants, there is no conflict between section 2—1003(a) and the rules of this court which pertain to discovery procedures. Defendants contend that the circuit courts remain free to issue protective orders or discovery sanctions as needed to curtail abuses of the discovery process.

We agree with plaintiffs that section 2—1003(a) creates an irreconcilable conflict with the inherent authority of the judiciary. Although we acknowledge that the legislature may, in some instances, share concurrent power with this court to prescribe procedural rules governing discovery (see, *e.g.*, *O'Connell v. St. Francis Hospital*, 112 Ill. 2d 273, 281 (1986); *Niven v. Siqueira*, 109 Ill. 2d 357, 368 (1985)), "we have not hesitated to strike down those procedural legislative enactments which unduly infringe upon our constitutional rule-

making authority" to regulate the judicial system of Illinois. *O'Connell v. St. Francis Hospital*, 112 Ill. 2d 273, 281 (1986).

In *O'Connell*, this court reaffirmed the established principle that where a statutory procedure conflicts with a rule of this court relating to the same procedure, the rule necessarily prevails. This court held that provisions of the Code of Civil Procedure which permitted plaintiffs to nonsuit their actions and then to commence a new action within a year following such dismissal unduly infringed upon the judiciary's powers, to the extent that the procedures allowed a plaintiff to avoid compliance with Supreme Court Rule 103(b) (134 Ill. 2d R. 103(b)). Rule 103(b) requires reasonable diligence in the service of process and specifies the consequences which result from a plaintiff's untimely service of process, either before or after the expiration of the statute of limitations. Because the statutory provisions under review in *O'Connell* gave the plaintiff an unconditional right to take a voluntary dismissal and to refile within a year of such dismissal, without regard to the expiration of the limitations period and without regard to the diligence provision of Rule 103(b), this court held that the statutes impermissibly conflicted with the rule.

In *Gibellina v. Handley*, 127 Ill. 2d 122 (1989), this court reaffirmed its authority to manage the court system by prohibiting an abuse of certain procedures, even though the statutes in issue did not directly conflict with a supreme court rule. The *Gibellina* court prospectively limited plaintiffs' statutory right to dismiss their actions and refile within one year, where, prior to the plaintiff's motion for voluntary dismissal, the defendants filed a motion for summary judgment. This court determined that a plaintiff should not be permitted to abuse the statutory right to refile a nonsuited action within a year where a defendant files a motion that

would dispose of the lawsuit on the merits. Accordingly, the *Gibellina* court upheld its authority to manage the court system of Illinois and to cure an abusive use of civil procedures which had burdened the courts and infringed upon the judiciary's ability to discharge its duties fairly and expeditiously.

In a different context, this court has reaffirmed the inherent power of the judiciary to exercise certain judicial functions, such as the power of contempt, without being bound by legislative regulation of such power. In *Murneigh*, 177 Ill. 2d 287, a statutory and administrative blood-collection scheme provided that judges "shall" enter orders requiring incarcerated sex offenders to give blood specimens. The scheme further required the courts to punish the violation of such compliance orders as contempt of court. We ruled that the provisions in issue violated separation of powers principles by conscripting the judiciary into the service of an essentially administrative function and by mandating the courts to enter contempt sanctions. *Murneigh*, 177 Ill. 2d at 313. This in turn intruded upon the judiciary's inherent and essential power of contempt, a power held exclusively by the judiciary. See also *Agran v. Checker Taxi Co.*, 412 Ill. 145 (1952); *Wright*, 63 Ill. 2d 313.

In the case at bar, as in *Murneigh*, the challenged legislation provides that the courts *shall* enter an order of compliance and further prescribes the sole sanction to be imposed if compliance is not met. Section 2—1003(a) directs that if a plaintiff fails to furnish the requested consent form within 28 days, "the court, on motion, shall issue an order authorizing disclosure to the party or parties requesting said consent of all records and information mentioned herein or order the cause dismissed pursuant to Section 2—619(a)(9)." 735 ILCS 5/2—1003(a) (West 1996). The language of this sec-

tion is mandatory rather than permissive. Therefore, section 2—1003(a) obligates the courts of this state to become party to the forced disclosure of confidential medical information *even if such material is wholly unrelated to the lawsuit in issue*, or, if the plaintiff refuses to comply, to enter an order of involuntary dismissal.

Because involuntary dismissals are considered to be adjudications on the merits (134 Ill. 2d R. 273), a plaintiff injured through the fault of another would lose his or her right of action as the penalty for not consenting to the blanket disclosure of all confidential medical information, irrespective of how irrelevant to the lawsuit and however personal, sensitive, or embarrassing the confidential medical information may be to the plaintiff.

Defendants rely on cases in which this court has upheld as constitutional certain legislative regulations of procedure and the filing of claims. For example, in *People v. Williams*, 124 Ill. 2d 300 (1988), this court held that a statute which provided for the substitution of judges did not unduly encroach on the powers of the judiciary. Similarly, defendants assert, this court has upheld statutes requiring the filing of certain materials as a prerequisite for obtaining judicial relief. See *DeLuna v. St. Elizabeth's Hospital*, 147 Ill. 2d 57 (1992) (requiring health care provider's affidavit certifying that plaintiff's medical malpractice claim had merit); *People ex rel. County Collector v. Jeri, Ltd.*, 40 Ill. 2d 293 (1968) (requiring that a transcript of evidence relating to the trial court's findings be attached to the order of tax deed).

We believe that the particular statutes upheld by this court in the above-cited cases withstood constitutional scrutiny for reasons not present in the instant case. In *Williams*, the provision allowing for a substitution of judges in certain instances caused only a minimal

encroachment upon judicial authority and did not prevent the courts from deciding cases or managing their dockets. In *Jeri,* the requirement that a transcript of evidence be attached to the order for tax deed was part of a purely statutory proceeding and its purpose was to safeguard against fraud. The challenged provision did not impede the courts in the performance of their functions and therefore did not violate separation of powers principles. In *DeLuna,* the certificate of merit requirement was found, *inter alia,* to be reasonably related to the legislative goal of discouraging the filing of frivolous medical malpractice actions by imposing the threshold requirement that a plaintiff obtain an expert medical opinion that his or her claim had merit. *De-Luna,* 147 Ill. 2d at 75. Unlike the mandatory consent and disclosure requirements of section 2—1003(a), the medical malpractice certificate of merit requirement upheld in *DeLuna* may be viewed as directly relevant, and explicitly tailored, to the plaintiff's cause of action. The certificate of merit requirement did not extend to medical information or expert opinion relating to health conditions of the plaintiff which were unrelated to the subject matter of the medical malpractice complaint. We conclude that the cases cited by defendants are distinguishable from the circumstances of the case at bar and are therefore inapposite.

Evaluating the relevance of discovery requests and limiting such requests to prevent abuse or harassment are, we believe, uniquely judicial functions. Similarly, the court's imposition of sanctions for a party's failure to comply with legitimate discovery requests in a timely fashion is an inherently judicial power. However, nothing in the express terms of section 2—1003(a) authorizes the circuit courts to assess the relevance of discovery or limit the scope of the defendant's demand for unlimited disclosure of all medical information in the possession

of anyone who provided health care to the plaintiff at any time. To the extent that a statute unduly interferes with the exercise of inherently judicial functions or powers, the statute cannot prevail. See *Gibellina*, 127 Ill. 2d 122. We believe that section 2—1003(a) impermissibly interferes with the inherently judicial authority to manage the orderly discovery of information relevant to specific cases. Therefore, the statute violates the separation of powers clause of the Illinois Constitution.

The judicial authority to limit discovery requests and to impose sanctions for discovery violations is, moreover, expressly embodied in the discovery rules of this court. Supreme Court Rule 201(a) contains the general statement that "[i]nformation is obtainable as provided in these rules." 166 Ill. 2d R. 201(a). The requirement that discovery requests be relevant to the subject matter of the litigation is specified in Rule 201(b) (166 Ill. 2d R. 201(b)). Rule 201(c)(1) prescribes the procedures for obtaining protective orders as a means of preventing abuse. 166 Ill. 2d R. 201(c)(1). In addition, Rule 219 provides the circuit courts with a range of options for imposing sanctions for a party's failure to comply with the discovery rules of this court or with orders of the circuit court pertaining to discovery. 166 Ill. 2d R. 219.

Rule 201(b)(1) provides, "Except as provided in these rules, a party may obtain by discovery full disclosure regarding any matter *relevant to the subject matter involved in the pending action* \*\*\*." (Emphasis added.) 166 Ill. 2d R. 201(b)(1). This rule expressly limits a party's right of "full disclosure" to matters which are relevant to the subject matter of the pending lawsuit. In contrast, section 2—1003(a) omits any mention of relevance in the consent requirements. Indeed, the statute contemplates maximum disclosure of confidential medical information, without regard to whether the information is relevant to the particular injuries upon

which the plaintiff's lawsuit is based. The statute provides that a plaintiff must waive "any privilege between the injured person and *each health care provider who has furnished care at any time* to the injured person." (Emphasis added.) 735 ILCS 5/2—1003(a) (West 1996). The unlimited scope of defendants' discovery in section 2—1003(a) therefore creates a direct conflict with Rule 201(b), which embodies an express rule of relevance regarding matters obtainable through discovery. Such conflict is resolved in favor of the rule of this court. See, *e.g.*, *O'Connell*, 112 Ill. 2d 273.

For similar reasons, we hold that section 2—1003(a) conflicts with Supreme Court Rule 201(c)(1), which governs the issuance of protective orders. Rule 201(c)(1) provides: "The court may at any time on its own initiative, or on motion of any party or witness, make a protective order as justice requires, denying, limiting, conditioning, or regulating discovery to prevent unreasonable annoyance, expense, embarrassment, disadvantage, or oppression." 166 Ill. 2d R. 201. In contrast, section 2—1003(a) fails to provide any means by which the circuit court may deny a disclosure request or narrow the scope of the consent. By its terms, therefore, the statute does not permit the circuit court to issue a protective order. Therefore, the statute conflicts with Rule 201(c)(1).

Section 2—1003(a) also fails to explicitly accommodate or recognize the judge's discretion to impose a discovery sanction other than a dismissal on the merits if the plaintiff fails to comply with the consent requirement. Supreme Court Rule 219 enumerates a range of noninclusive sanctions to address discovery violations and abuses, including the award of expenses, the barring of a witness, the suppression of otherwise discoverable information as a sanction for abuse, the striking of any or all pleadings relating to an issue, and other op-

tions for the circuit court to choose in the exercise of its sound discretion. Because section 2—1003(a) directs the circuit court's selection of just one sanction for a plaintiff's noncompliance with the consent request— involuntary dismissal—the statute conflicts with Rule 219 as well as the previously discussed provisions of Rule 201. Accordingly, we conclude that section 2—1003(a) violates the separation of powers clause of the Illinois Constitution because the statute directly conflicts with the discovery procedures that have been expressly promulgated as rules of this court pursuant to its constitutional rulemaking authority.

Defendants insist that nothing in section 2—1003(a) precludes a plaintiff from filing, and the circuit court from granting, a protective order pursuant to Supreme Court Rule 201(c). In fact, during oral argument of *Kunkel v. Walton*, 179 Ill. 2d 519 (1997), attorneys for the defendants and for the Attorney General, as intervenor, contended that circuit court judges remain free to enter protective orders and to enter sanctions other than dismissal, despite the fact that such measures are not included within the express terms of section 2—1003(a). The defendants contend that section 2—1003(a) does not conflict with this court's rules and may be construed in a constitutional manner. For the reasons stated below, however, we believe that the defendants' proposed construction of section 2—1003(a) is inconsistent with the plain terms and intent of the mandatory consent and disclosure requirements, and we therefore reject as untenable the defendants' attempt to harmonize section 2—1003(a) with this court's rules. We further determine that the defendants' proposed construction of the statute does not cure the separation of powers violation created by the application of the statute.

To evaluate the defendants' statutory construction argument, we again look to the specific language in the

statute and the reasonable inferences that may be drawn therefrom. As we have already determined, the plain terms of the statute do not encompass any explicit procedures by which a plaintiff may object to the request for unlimited consent to the disclosure of confidential medical information. Nor does the statute refer to the court's authority to enter protective orders to prevent discovery abuses under Rule 201(c)(1), or to enter any sanctions other than dismissal of a plaintiff's action. Accordingly, we conclude that under a "plain terms" construction of section 2—1003(a), the statute cannot reasonably be construed as allowing the circuit court to limit the scope of a consent request through protective orders. In light of the express requirements of the statute, the circuit court is not permitted to impose a sanction for noncompliance other than dismissal of the plaintiff's cause of action.

The defendants nonetheless argue that the statute may be construed to permit the circuit court judges to retain discretion over the scope of the discovery because of the following sentence in section 2—1003(a): "The provisions of this subsection (a) do not restrict the right of any party to discovery pursuant to rule."[10]

In our view, this sentence does not support the defendants' argument that section 2—1003(a) may be construed as permitting the circuit court to enter protective orders and to impose discretionary sanctions for noncompliance. The quoted sentence does not incorporate any limits or rules that might narrow the scope of the consent requirements of the statute. Instead, the quoted sentence refers to a party's general right to

---

[10]We note that the legislative debate provides little insight into whether the sponsors of Public Act 89—7 intended that the circuit courts would retain their discretion to enter protective orders and to impose sanctions other than the dismissal specified in section 2—1003(a).

obtain discovery pursuant to this court's rules. To read in limiting language which is not expressly included in the framework of section 2—1003(a) is to create a contradiction within the statute itself. For example, if a plaintiff sought a protective order requesting the court to prohibit defense counsel from engaging in *ex parte* conferences with the plaintiff's treating physician, the court would be required to either (1) ignore the express language of the statute or (2) determine that, because of the sentence quoted above, the court retained discretion to determine that an *ex parte* conference was an abuse of discovery. The dilemma facing such a court is obvious: the court must apply the statute as written, or else adopt an expansive interpretation that would defeat the essential purpose and express language of the statute. Allowing courts to freely limit the scope of the mandatory consent requirement would thwart the legislative intent to permit the broadest possible disclosure of medical information and to authorize unlimited *ex parte* conferences with the plaintiff's treating health care practitioners. Therefore, we reject the defendants' statutory construction analysis as contrary to the plain terms and intent of the provision.

But even if we were to accept the statutory construction proposed by the defendants, there is a remaining flaw in the analysis which underscores the separation of powers concerns previously identified. A discovery procedure which authorizes unlimited disclosure of information in the first instance, subject only to particularized protective orders, shifts a significant burden to the courts of this state to repeatedly assess and limit, through entry of protective orders, discovery requests that may well be overbroad on their face. The expansive impact of the statutory consent requirements virtually demands that plaintiffs' attorneys file motions for protective orders as a matter of course whenever a

consent form is requested by defense counsel. Although the judiciary is the proper entity to determine the need for protective orders, on a case-by-case basis, one of the effects of section 2—1003(a) is to create an assembly line of overbroad discovery requests followed by motions for protective orders. We believe, therefore, that section 2—1003(a) impermissibly burdens and significantly infringes upon the inherent judicial powers that are constitutionally granted to the courts. See, *e.g.*, *Murneigh*, 177 Ill. 2d 287 (rejecting legislative mandate that the contempt power be used to facilitate administrative or executive scheme); *People v. Joseph*, 113 Ill. 2d 36 (1986) (striking statute requiring all post-conviction proceedings to be conducted by judge who was not involved in original proceeding as encroaching upon court administration); *People v. Flores*, 104 Ill. 2d 40, 49 (1984) (invalidating statute which interfered with the ability of a trial judge to control his own docket after the trial of a cause had begun); see also *Gibellina*, 127 Ill. 2d 122. It is the duty of this court to invalidate legislation that significantly burdens or otherwise curtails the inherent and constitutionally granted authority of the judiciary. See *Davis*, 93 Ill. 2d at 161. Accordingly, we hold that section 2—1003(a) is invalid as violating the separation of powers clause of the Illinois Constitution.

### B. Right to Privacy and The Petrillo Doctrine

We next consider plaintiffs' argument that section 2—1003(a) violates the privacy rights of Illinois citizens. In support of this argument, plaintiffs cite to the two clauses in the Illinois Constitution which expressly refer to privacy. See Ill. Const. 1970, art. I, §§ 6, 12. They further ground their privacy argument in the *Petrillo* doctrine, which recognized a strong public policy in preserving the confidential and fiduciary physician-patient relationship and held that such public policy is violated

by *ex parte* communications between defendants or their counsel and plaintiffs' treating physicians.

Defendants counter that there is no constitutional right to privacy in medical information under federal or state decisions. Furthermore, the defendants argue, the branch of government charged with declaring the public policy of this state is the legislature. According to defendants, the legislature acted well within its authority in providing for *ex parte* conferences between the plaintiff's health care practitioners and representatives of the defendants. Finally, defendants posit that the *Petrillo* doctrine was never expressly adopted by this court and that the legislature is free to overturn it.

In 1970, the Illinois Constitution was amended to include two separate provisions which expressly refer to a citizen's expectations of privacy. Section 12 of the Illinois Constitution's Bill of Rights provides that "[e]very person shall find a certain remedy in the laws for all injuries and wrongs which he receives to his person, *privacy*, property or reputation. He shall obtain justice by law, freely, completely, and promptly." (Emphasis added.) Ill. Const. 1970, art. I, § 12. Section 6 of the Illinois Bill of Rights states, "The people shall have the right to be secure in their persons, houses, papers and other possessions against unreasonable *** invasions of privacy ***." Ill. Const. 1970, art. I, § 6.[11]

The Constitutional Commentary to section 6 of the Bill of Rights explains that "[t]he protection against 'invasion of privacy' is new and is stated broadly" and "expands upon the individual rights which were contained in Section 6 of Article II of the 1870 Constitution and the guarantees of the Fourth and Fourteenth Amendments to the United States Constitution." Ill.

[11]Because plaintiffs do not base their claim on a federal right to privacy, we do not discuss any federal cases involving privacy interests.

Ann. Stat., 1970 Const., art. I, § 6, Constitutional Commentary, at 522 (Smith-Hurd 1997). With reference to section 6, this court has observed that "[b]ecause the Illinois Constitution recognizes a zone of privacy, the protections afforded by the Illinois Constitution go beyond the guarantees of the Federal Constitution. *In re May 1991 Will County Grand Jury* (1992), 152 Ill. 2d 381." *King v. Ryan,* 153 Ill. 2d 449, 464 (1992); see also *Fink v. Ryan,* 174 Ill. 2d 302 (1996); *cf. People v. DiGuida,* 152 Ill. 2d 104, 119 (1992) (referring to a 1984 decision in which this court indicated it would interpret section 6 of the Illinois Bill of Rights as consistent with its counterpart, the fourth amendment to the federal constitution). This court has stated that governmental conduct or "state action" must be present before a citizen claiming a violation of the privacy right referenced in section 6 of the Illinois Bill of Rights may obtain relief. See *Barr v. Kelso-Burnett Co.,* 106 Ill. 2d 520, 526 (1985) (rejecting plaintiff's argument that employer's alleged violation of free speech, equal protection, due process, and privacy rights provided a proper foundation on which to premise plaintiff's action for retaliatory discharge); see also *People v. DiGuida,* 152 Ill. 2d at 121-24 (rejecting defendant's free speech and free elections challenge as a means to challenge his conviction for criminal trespass to private store owner's land).

In considering section 6 of the Illinois Bill of Rights in conjunction with section 12, this court has stated that the "constitutional right to be free from governmental invasions of privacy [in section 6] is supplemented by the constitutional right to a certain remedy for invasions or injuries to one's privacy provided for in article I, section 12, of the Illinois Constitution of 1970." *In re A Minor,* 149 Ill. 2d 247, 256 (1992). In *Minor,* a news organization attending a juvenile court hearing sought permission to disclose the names of the minor victims of

abuse. Pursuant to a provision of the Juvenile Court Act, the circuit court prohibited the newspaper from disclosing the identities of the minor victims. The newspaper appealed. This court affirmed, holding that the statutory provision which permitted the news media to attend hearings closed to the general public did not grant the media a right to disclose the minor victims' names. This court held that the circuit court's order barring disclosure of the victims' identities was not an unconstitutional prior restraint on the freedom of the press. *Minor*, 149 Ill. 2d at 253-57. After citing the two privacy clauses of the Illinois Constitution, the court determined that the minor victims had a compelling privacy interest at stake. *Minor*, 149 Ill. 2d at 255. In reviewing the history of section 12 of the Illinois Bill of Rights, the *Minor* court held it does not require the presence of state action. The court concluded,

> "It is clear from the debates in the Sixth Illinois Constitutional Convention that article I, section 12, was intended to protect an individual's privacy from invasions or injuries caused by another *nongovernmental* individual or company. 3 Record of Proceedings, Sixth Illinois Constitutional Convention 1531-32." (Emphasis in original.) *Minor*, 149 Ill. 2d at 256.

Consistent with this court's holding in the *Minor* case, we recognize that section 12 of the Illinois Constitution, unlike section 6, does not require state action before its protections are activated. However, the precise nature and scope of the privacy interest set forth in section 12 has not been the subject of much case law in this state. Plaintiffs cite cases in which a constitutional right to privacy was found in bank records (*People v. Jackson*, 116 Ill. App. 3d 430, 434-35 (1983)) and telephone records (*People v. DeLaire*, 240 Ill. App. 3d 1012, 1020 (1993); *cf. People v. Smith*, 72 Ill. App. 3d 956, 964 (1979)). In addition, plaintiffs rely on *Petrillo* for the proposition that the "privacy rights of individual

patients" and the "confidential and fiduciary relationship existing between patients and their physicians" are compelling interests deserving of protection for reasons of public policy. *Petrillo*, 148 Ill. App. 3d at 607.

In *Petrillo*, a product liability action, defense counsel informed the trial court that he had previously met in private with a treating physician for one of the 26 plaintiffs in the case. Upon learning of the meeting, plaintiffs' counsel moved to bar any future *ex parte* communications between defense counsel and any other physician. The trial court granted the motion and entered an order to that effect. Defense counsel, however, informed the court that he did not intend to comply with the order. The trial court, therefore, held the attorney in direct contempt, and the attorney appealed.

In affirming the trial court's order, the appellate court initially noted that *ex parte* conferences were not necessary to obtain information for defending a lawsuit because the discovery methods outlined by Supreme Court Rule 201 were sufficient. The court determined that a review of case law from other jurisdictions revealed that there was not a single instance in which a court found that an *ex parte* conference was necessary to assist defense counsel in obtaining information that they were unable to acquire through "regular channels of discovery." *Petrillo*, 148 Ill. App. 3d at 587.

The *Petrillo* court emphasized that society places a high value on the professional duties under which a physician operates, including the dual duties of confidentiality and loyalty. *Petrillo*, 148 Ill. App. 3d at 589-92. The court noted that certain conduct could be against public policy even in the absence of an express constitutional or statutory prohibition because public policy could be inferred from such sources as statutes or constitutions. Reasoning that there exists a strong pub-

lic policy in preserving the sanctity of the patient-physician relationship and acknowledging the plaintiff's privacy interests, the court determined that *ex parte* conferences unduly threatened society's interest in maintaining the fiduciary and confidential nature of the relationship. *Petrillo*, 148 Ill. App. 3d at 589-96. Accordingly, the court held that *ex parte* conferences between a plaintiff's physician and defendant or his counsel should not be permitted. *Petrillo*, 148 Ill. App. 3d at 596.

In the years following the decision in *Petrillo*, all five districts of our appellate court have followed the decision and, although the specific application of *Petrillo* to various facts has differed in some respects, "the fundamental holding that ex parte discussions between defense counsel and plaintiff's treating physician shall be conducted only through authorized methods of discovery has been overwhelmingly approved in subsequent Illinois Appellate Court cases." L. Bonaguro & M. Jochner, *The Petrillo Doctrine: A Review and Update*, 83 Ill. B.J. 16, 16 (1995). Other articles, which have analyzed the policy grounds on which the *Petrillo* court based its decision, have either endorsed the prohibition of *ex parte* communications (see P. Corboy, *Ex Parte Contacts Between Plaintiff's Physician and Defense Attorneys: Protecting the Patient-Litigant's Right to a Fair Trial*, 21 Loy. U. Chi. L.J. 1001 (1990)) or questioned the "new type of witness privilege" created in *Petrillo* and the perceived expansion of the original decision beyond its natural boundaries (see W. McVisk, *A More Balanced Approach to Ex Parte Interviews by Treating Physicians*, 20 Loy. U. Chi. L.J. 819 (1989); see also C. Redden & W. Bower, *Qualifications to the Bar of Ex Parte Contacts With Physicians*, 79 Ill. B.J. 442 (1991)).

We do not believe it is necessary, practical, or appropriate for this court to review every case in which the *Petrillo* rule has been applied, distinguished, or

otherwise discussed. However, because the legislative decision to eviscerate the *Petrillo* "rule" has been questioned by plaintiffs as part of their challenge to section 2—1003(a), we find it appropriate to examine the rationale of the *Petrillo* decision and to ascertain whether there exists a constitutional source for the recognition of a strong public policy interest in preserving the sanctity of the physician-patient relationship. We acknowledge that the *Petrillo* decision did not directly recognize a constitutional basis for its holding, and we further acknowledge that there was no issue raised in *Petrillo* that the plaintiff's privacy interest in confidential medical information was protected by the Illinois Constitution. However, the *Petrillo* court expressly acknowledged that the public policy of this state is reflected in constitutional provisions as well as statutes. We believe that it is proper for this court to consider the Illinois Constitution's privacy provisions as reflective of an important policy. With that in mind, we consider the important public policy considerations that the *Petrillo* court found compelling enough to bar *ex parte* conferences.

In his appeal from the order holding him in contempt of court, the attorney in *Petrillo* raised several arguments. A group of arguments, collectively referred to as the "waiver" challenges, stated that a plaintiff, by filing suit, places his mental and physical condition at issue, thereby waiving the physician-patient privilege. The waiver issue was further broken down into 10 related arguments in which the attorney sought to justify *ex parte* conferences between defense counsel and the treating physicians of the plaintiff. In addition, the attorney posited that prohibiting defense counsel from engaging in *ex parte* conferences with a plaintiff's treating physician violated defense counsel's first amendment rights. *Petrillo*, 148 Ill. App. 3d at 584.

After initially concluding that *ex parte* conferences were not necessary for the preparation of a defense, the *Petrillo* court announced its disagreement with the defense attorney's contention that no public policy in Illinois prohibited *ex parte* conferences. According to the court, "Public policy is found in a State's constitution and statutes, and where those are silent, in the decisions of the judiciary." *Petrillo*, 148 Ill. App. 3d at 587. Noting that public policy forbids "that conduct which tends to harm an established and beneficial interest of society the existence of which is necessary for the good of the public," the court held that "modern public policy strongly favors the confidential and fiduciary relationship existing between a patient and his physician." *Petrillo*, 148 Ill. App. 3d at 587. The court stated its belief that this public policy was reflected in at least two separate indicia: (1) the code of ethics adopted by the medical profession, upon which the public necessarily relies as, a protection of the confidential relationship existing between a patient and his physician; and (2) the fiduciary relationship which exists between a physician and his patient, which is widely recognized in court opinions.

The first indicia of the public policy invaded by *ex parte* conferences, the medical profession's code of ethics, was further broken down by the *Petrillo* court into three "prongs": (1) the Hippocratic Oath; (2) The American Medical Association's Principles of Medical Ethics; and (3) the Current Opinions of the Judicial Council of the AMA (1984 ed.)[12]

Observing that the relationship between doctor and

---

[12]The Hippocratic Oath, according to the Judicial Council of the AMA, was conceived during the fifth century B.C. and stands as the oldest statement of ethics governing the medical profession. It requires the oath taker to keep secret confidential matters relating to patients. Similarly, the AMA's principles of medical ethics and the opinions of the Judicial Council of the AMA emphasize duties of honesty and confidentiality to the patient

patient remains confidential only for so long as a patient can trust that his consent is a prerequisite to the disclosure of the information he conveyed to his doctor, the *Petrillo* court concluded that when a physician and defense counsel engage in *ex parte* conferences without the consent of the patient, the confidentiality which once existed between the doctor and patient is irreparably breached and the "sanctity of the relationship existing between a patient and his physician is thereby destroyed." *Petrillo*, 148 Ill. App. 3d at 591. Significantly, the *Petrillo* court distinguished between medical information which is considered waived by the filing of a lawsuit and information which is not waived. The court noted that disclosure of information could be accomplished by either an express consent or one implied at law by the patient's conduct, such as the filing of a lawsuit. With respect to the latter situation, the patient filing suit implicitly agrees to his or her doctor's release of any medical information related to the specific physical or mental condition which the patient has placed in issue. However, the plaintiff's implied consent (or waiver of information) "is obviously and necessarily limited; he consents only to the release of his medical information (relative to the lawsuit) *pursuant to the methods of discovery authorized by Supreme Court Rule 201(a)* (87 Ill. 2d R. 201(a))." (Emphasis in original.) *Petrillo*, 148 Ill. App. 3d at 591. The plaintiff-patient does not, by the simple act of filing suit, consent to *ex parte* discussions between his treating doctor and defense counsel, nor does he consent to disclosure of confidential information unrelated to the subject matter of the lawsuit. The *Petrillo* court concluded, consistent with the courts of other

and preservation of the patient's confidential information. Additionally, the prior express consent of the patient to disclosure of confidential information is considered a right of the patient. See *Petrillo*, 148 Ill. App. 3d at 590.

jurisdictions, that patients have the right to rely on their physicians' compliance with the ethical obligations of confidentiality, and barring *ex parte* conferences is a necessary adjunct to preserve that right.

The *Petrillo* court also discussed what it considered to be the second "indicia" of the public policy against *ex parte* conferences between defense counsel and plaintiff's treating physicians. Similar to the confidentiality/privacy discussion addressed above, this portion of the appellate court's opinion found that society has an established interest in the *fiduciary* quality of the physician-patient relationship. Citing cases from Illinois and other jurisdictions, the *Petrillo* court stated that the fiduciary relationship between doctor and patient is founded upon trust and confidence. Implied in this fiduciary relationship is a "good faith" requirement that the physician will not engage in conduct adverse to his or her patient, including *ex parte* conferences with the patient's opposing counsel. Emphasizing that at the heart of a fiduciary relationship is trust, loyalty, and faith in the discretion of the fiduciary, the court in *Petrillo* concluded that *ex parte* conferences with defense counsel constituted a serious breach of trust. *Petrillo*, 148 Ill. App. 3d at 596.

We believe that the rationale of the *Petrillo* court is sound and that there is a strong public policy against *ex parte* conferences between the plaintiffs' health care practitioners and defendants or their representatives. We further believe that the privacy interest referred to in the "certain remedy" clause of section 12 provides a constitutional source for the protection of the patient's privacy interest in medical information and records that are not related to the subject matter of the plaintiff's lawsuit. We acknowledge that the certain remedy provision has been referred to in general as a statement of philosophy rather than a guarantee of a specific rem-

edy. See *Sullivan v. Midlothian Park District*, 51 Ill. 2d 274, 277 (1972). Nonetheless, we believe that a statement of "constitutional philosophy" is reflective of the strong public policy that was recognized in *Petrillo*. Therefore, we conclude that patients in Illinois have a privacy interest in confidential medical information, and that the *Petrillo* court properly recognized a strong public policy in preserving patients' fiduciary and confidential relationship with their physicians.[13]

## VI. Severability

We have declared that certain provisions of Public Act 89—7 violate the Illinois Constitution. Specifically, we have invalidated the cap on noneconomic damages, the provision which gives a credit to third-party tortfeasors in the amount of the employer's proportionate share of liability, the abolition of joint and several liability, and the provision of the Code of Civil Procedure which requires the wholesale disclosure of confidential medical information upon the filing of a personal injury lawsuit. Our next determination is whether the legislature would have passed the Act in the truncated form that remains after these invalid provisions are eliminated. Under principles of severability, we consider whether the provisions that we have not declared invalid may be given effect independently, without doing violence to the legislative intent in passing the comprehensive tort reform legislation. See, *e.g.*, *Murneigh*, 177 Ill. 2d at 313-14. If, however, the invalid portions may not be severed from the remainder of the Act, the legislation is rendered void in its entirety. See, *e.g.*, *City*

---

[13]We do not, however, create a broad-based remedy for perceived violations of a person's privacy interests by private parties. Instead, we focus narrowly on the constitutional source of the privacy interest that can be deemed a part of the public policy of this state.

*of Chicago Heights v. Public Service Co.*, 408 Ill. 604, 610-11 (1951); *Dornfeld v. Julian*, 104 Ill. 2d 261 (1984).

Whether or not an act is severable is a question of legislative intent. *E.g.*, *Russell Stewart Oil Co. v. State*, 124 Ill. 2d 116, 128 (1988); *Dornfeld*, 104 Ill. 2d at 265-66. It has been noted that this inquiry is twofold, because the legislature must have intended that the act be severable, and the act must be capable of severability in fact. See 2 N. Singer, Sutherland on Statutory Construction § 44.03, at 495 (5th ed. 1993); see also *City of Chicago Heights*, 408 Ill. at 610-11. To determine whether an act is severable this court has often repeated, as the "settled and governing test of severability," whether the valid and invalid provisions of the Act are " 'so mutually "connected with and dependent on each other, as conditions, considerations or compensations for each other, as to warrant the belief that the legislature intended them as a whole, and if all could not be carried into effect the legislature would not pass the residue independently ***".' [Citation.] The provisions are not severable if 'they are essentially and inseparably connected in substance.' [Citation.]" *Fiorito v. Jones*, 39 Ill. 2d 531, 540-41 (1968); accord *People ex rel. Rudman v. Rini*, 64 Ill. 2d 321, 329 (1976); *Northern Illinois Home Builders Ass'n v. County of Du Page*, 165 Ill. 2d 25, 48-49 (1995); see also *Commercial National Bank v. City of Chicago*, 89 Ill. 2d 45, 73-74 (1982) (and cases cited therein).

Determining whether portions of an act are severable is a matter of statutory construction, and the existence of a severability clause within the statute is not conclusive of the issue. Instead, an express severability clause may be viewed as a rebuttable presumption of legislative intent. See, *e.g.*, *Jacobson v. Department of Public Aid*, 171 Ill. 2d 314, 329 (1996); *Commercial National Bank*, 89 Ill. 2d at 75; *Grennan v. Sheldon*, 401 Ill. 351, 360-61 (1948). In the case at bar, Public Act

89—7 includes a general severability provision, which states: "The provisions of this Act, including both the new and the amendatory provisions, are severable under section 1.31 of the Statute [on] Statutes." Pub. Act 89—7, § 990, citing 5 ILCS 70/1.31 (West 1996). Although the enactment of a severability provision reflects a legislative effort to preserve an act notwithstanding a declaration of partial invalidity, it has been noted that "[b]ecause of the very frequency with which it is used, the severability clause is regarded as little more than a mere formality." 2 N. Singer, Sutherland on Statutory Construction § 44.08, at 521 (5th ed. 1993). This court has noted that a severability clause "may be useful as an aid in determining legislative intent, [but] it is not an 'inexorable command' [citation] *** '*** and [it] must be applied in conformity with the rules of constitutional law.' [Citation.]" *Commercial National Bank*, 89 Ill. 2d at 74. See also *People ex rel. Chicago Bar Ass'n v. State Board of Elections*, 136 Ill. 2d 513, 532 (1990) (noting that this court "has frequently held that unconstitutional provisions of a statute were not severable from the remainder of the statute even though the statute itself contained a severability clause").

In *Jacobson*, 171 Ill. 2d at 329, we held that the presumption of severability reflected by an express severability clause will be overcome and the entire statute held unconstitutional if the legislature would not have passed the statute without the provision deemed invalid. *Jacobson*, 171 Ill. 2d at 329, citing *Northern Illinois Home Builders Ass'n*, 165 Ill. 2d at 48. To determine whether the legislature would have passed the statute without the provision declared invalid, the courts consider whether the legislative purpose or object in passing the act is significantly undercut or altered by the elimination of the invalid provisions. For example, in *Grennan*, this court invalidated the entire Hospital

Authorities Act of 1947 after finding that the invalid provisions, which contained an arbitrary classification of voters, could not be severed from the remaining provisions without defeating the object of the act. *Grennan*, 401 Ill. at 360-61.

Similarly, in *City of Chicago Heights*, this court held invalid in its entirety a public utility regulatory scheme after finding that the license and permit fees imposed by the ordinance were excessive and unreasonable as a matter of law. *City of Chicago Heights*, 408 Ill. at 609-10. This court next addressed whether the invalid license and permit fee provisions were severable from the remainder of the ordinance, which regulated other supervisory duties imposed upon the department of streets. Holding that the stricken provisions were "manifestly the most important part of the regulatory system," this court concluded that it could not determine that the council would have adopted the ordinance without the provisions that had been declared invalid; consequently, the entire ordinance was held null and void. *City of Chicago Heights*, 408 Ill. at 611. See also *People ex rel. Barrett v. Union Bank & Trust Co.*, 362 Ill. 164, 170 (1935) (invalid provision of banking statute held not severable from remainder of statute).

Even in cases where the valid sections of an act are complete and capable of being executed, the entire act will be declared void if, after striking the invalid provisions, the act that remains does not reflect the legislative purpose in enacting the legislation. For example in *Village of Schaumburg v. Jeep Eagle Sales Corp.*, 285 Ill. App. 3d 481, 489 (1996), the court held that certain provisions of a sign ordinance which imposed restrictions as to the type, number, and height of flags impermissibly distinguished corporate and official flags from all other flags. In holding invalid the content-based restrictions, the court held that the other restrictions, although

complete and capable of being executed, could not be severed from the invalid portions because the effect of enforcing the remaining provisions would be contrary to the original intent of the ordinance. *Village of Schaumburg,* 285 Ill. App. 3d at 489. Similarly, in *Lee v. Retirement Board of the Policeman's Annuity & Benefit Fund,* 31 Ill. 2d 252 (1964), the invalidation of a portion of an amendment rendered the entire amendment void because it no longer reflected the legislature's intention, which was to grant special pension credits to policemen on a particular eligibility roster. Removing the language that limited the preference to the one group of officers would have had the unintended effect of expanding the application of the preference to a much larger group of policemen, thereby increasing the taxpayers' burden. Such a result would not be consistent with the legislature's goals in enacting the amendment. *Lee,* 31 Ill. 2d at 255-56. See also *Union Bank & Trust Co.,* 362 Ill. at 170; *People ex rel. Chicago Bar Ass'n,* 136 Ill. 2d at 534-36.

In contrast to the above cases, statutes have been upheld notwithstanding the invalidation of a provision where such provision was not considered to be so inextricably connected to the rest of the act that the legislature would not have passed the one portion without the other. For example, in *Dornfeld,* this court held that a two-year limitation period for bringing a paternity action violated the equal protection rights of the children of unwed parents. *Dornfeld,* 104 Ill. 2d at 265. On the question of severability, this court held that the limitations provision could be removed from the Paternity Act without violating the purpose of the legislation and thus did not render the entire act invalid. *Dornfeld,* 104 Ill. 2d at 266-67. Similarly, in *Northern Illinois Home Builders Ass'n,* this court reviewed and rejected several constitutional challenges

to a scheme under which Du Page County was authorized to impose transportation impact fees on new land developments. One provision under review was held invalid under equal protection and uniformity principles, as unduly burdening the appeal rights of certain fee payers. *Northern Illinois Home Builders Ass'n*, 165 Ill. 2d at 48. In holding that this provision was severable from the remainder of the ordinance, we held that the ordinance still served the legislature's intent of ensuring that new developments pay their fair share of road improvements. *Northern Illinois Home Builders Ass'n*, 165 Ill. 2d at 49. See also *Murneigh*, 177 Ill. 2d at 313-14; *Tully v. Edgar*, 171 Ill. 2d 297 (1996).

After reviewing the general principles of severability reflected in the foregoing authorities, we consider the General Assembly's intent in passing the legislation introduced as House Bill 20 and enacted, without compromise or revisions, as Public Act 89—7. As this court has previously noted, legislative history is relevant to our analysis of severability. See, *e.g.*, *People ex rel. Chicago Bar Ass'n*, 136 Ill. 2d at 536-37; *People v. Porter*, 122 Ill. 2d 64, 81 (1988). It is not disputed that the sponsors and supporters of the bill intended to effectuate comprehensive reform of the current tort system in Illinois. As such, House Bill 20 represented a major piece of tort legislation, of unparalleled scope and potential impact on the citizens of this state. The transcripts of the legislative debate reflect that House Bill 20 was presented to the full house for vote as a whole, integrated piece, and that the presentation of any modifications or amendments was discouraged. See 89th Ill. Gen. Assem., House Proceedings, February 16, 1995, at 136. It is undisputed that the bill was distributed to the full membership of the house minutes before midnight on the evening before the floor debates were to be held. It is also undisputed that opponents of the bill objected to

the speed with which the bill, and its restructuring of Illinois tort law, was pushed through the legislative process. This lengthy piece of legislation with its numerous provisions affecting the landscape of tort liability was presented to the full house for discussion just hours after its distribution, and was put to a vote the next day. No amendments were considered or accepted. On the contrary, House Bill 20 was adopted unchanged, as an integrated "reform package." One inference to be drawn from the manner in which the legislation was adopted is that the individual pieces of the package are inseparable from the whole.

Strong support for this inference is defendants' concession that the cap on noneconomic damages was considered essential to the legislation enacted. According to Representative Cross, the sponsor of the bill in the House, "this cap is the centerpiece of all these reforms." 89th Ill. Gen. Assem., House Proceedings, February 16, 1995, at 19 (statements of Representative Cross). The language of the preamble to the Act reinforces that key role of the damages cap; out of 17 clauses in the preamble characterized as "legislative findings," no less than eight cite noneconomic damages as a major concern of the legislature. During oral argument of this case, counsel for defendants confirmed that the noneconomic cap on damages is central to the legislative scheme of tort reform. In fact, so vital to the Act's purpose is the cap on noneconomic damages that the legislature included, in section 2—1117, an express exception to several liability that would operate only in the event that the cap was declared invalid. In such a case, the imposition of several liability as applied to health care providers is to be replaced with joint and several liability, which Public Act 89—7 abolished in all types of personal injury cases. As we held elsewhere in this opinion, such an attempt to create a limited excep-

tion to the abolition of joint liability constitutes invalid special legislation. For purposes of severability analysis, this legislative attempt to single out one class of plaintiffs or tortfeasors for separate treatment, based on the eventuality that the cap was invalidated, demonstrates that key provisions of the Act are interconnected and mutually dependent upon each other.

In addition to the emphasis that the preamble places on the noneconomic damages cap, another important goal expressed in the preamble is to reinforce fault-based liability and to insure that tortfeasors bear only their proportionate share of liability to injured plaintiffs. As a means to accomplish this express goal, Public Act 89—7 abolishes joint liability in favor of several liability. Ergo, the abolition of joint liability is, like the cap, central to the purposes of the Act. The removal of these two central goals of Public Act 89—7 (the imposition of the cap and the abolition of joint liability) defeats, in large part, its *raison d'etre.*

The legislation under review is a collection of interconnected provisions which address different aspects of tort liability, but nonetheless share the overriding determination to fulfill the goals set forth in the preamble. The summary of legislative purpose in the preamble enumerates these goals, which reflect the legislative intent to replace tort liability in its current form with a system featuring a damages cap, several liability instead of joint and several liability, and a reduction in the number of medical malpractice and product liability lawsuits filed. Other stated goals include protecting the economic health of business and units of local government, protecting the availability of affordable liability insurance, and decreasing the systemic costs of tort recovery. It is evident from the language of the preamble, the provisions of the Act itself, the legislative history, and defendants' arguments in the case at

bar that Public Act 89—7 was intended to have a broad, systemwide impact on the litigation of personal injury lawsuits. As such, implementation of the Act's provisions would modify or supplant a vast body of tort principles developed in many decisions of Illinois courts. For purposes of severability analysis, we cannot conclude that the legislature would have intended to pass a version of tort reform that did not include the measures by which to accomplish its goals.

In summary, core provisions of Public Act 89—7 have been declared unconstitutional by this court. Without these core provisions, which were essential to the passage of the Act and which are inseparable from the remainder of Public Act 89—7, the legislation must fail *in toto*. We conclude that we cannot hold independently enforceable that residue which remains of Public Act 89—7 after eliminating the core provisions through which the Act intended to accomplish its goals. To do so we would be, in effect, rewriting Public Act 89—7 and refashioning it into another piece of legislation that the legislature cannot be presumed to have intended to enact. As this court observed in *Commercial National Bank*, 89 Ill. 2d at 75, " '[t]he new law would be created by this court and not by the General Assembly, because it enacted a different one. This would amount to a delegation of legislative powers to the courts, which is contrary to article III of the constitution, as well as numerous decisions of this court.' [Citation]." Accordingly, we hold that Public Act 89—7 is void in its entirety.

VII. Other Provisions of Public Act 89—7

Because of our severability holding, we address only briefly the other specific provisions of the Act that were challenged in the instant appeal. The circuit court ruled that section 2—1107.1, which describes three jury instructions to be given in tort actions, is unconstitu-

tional. One jury instruction would prevent the jury from being informed about the cap on noneconomic or punitive damages. Clearly, this instruction is nullified by our declaration that the cap itself is unconstitutional. See 2 N. Singer, Sutherland on Statutory Construction § 44.04, at 502 (5th ed. 1993) ("Even where part of an act is independent and valid, other parts which are not themselves substantively invalid but have no separate function to perform independent of the invalid portions of the act are also held invalid"). The other two jury instructions are not clearly invalid, however. One of these jury instructions would require the court to inform the jury that compensatory and punitive damage awards are not taxable. The other instruction would prevent the jury from being informed that the plaintiff would not recover any damages if his or her contributory negligence exceeded 50% percent. Because of our determination that the valid provisions of the Act are not severable from the invalid provisions, we strike these two instructions without expressing any opinion regarding their constitutionality independent of the Act.

The circuit court also invalidated five specific provisions that relate to product liability actions. One provision, section 2—623, requires product liability plaintiffs to attach a certificate of merit to their complaint as a prerequisite for initiating an action to recover damages. 735 ILCS 5/2—623 (West 1996). Although a certificate of merit requirement in medical malpractice actions was upheld by this court in *DeLuna v. St. Elizabeth's Hospital*, 147 Ill. 2d 57, 75 (1992), plaintiffs attempt to distinguish *DeLuna* and also, in the alternative, request us to reconsider the *DeLuna* holding. Another section, which amends the existing product liability statute of repose, extends the limitation periods and outside period of repose to include all theories of product liability. 735 ILCS 5/13—213(b) (West 1996). In contrast, the prior

version of the repose statute excluded negligence from its scope. See 735 ILCS 5/13—213(b) (West 1994). Defendants contend that this court's decision in *Mega v. Holy Cross Hospital*, 111 Ill. 2d 416, 422 (1986), which upheld a four-year statute of repose in medical malpractice actions, is persuasive authority for upholding the constitutional validity of section 13—213(b). Two other provisions that were declared invalid by the circuit court, sections 2—2103 and 2—204, create statutory presumptions as to when a product is considered reasonably safe. Section 2—2103 attaches a presumption of safety to any product that meets state or federal safety standards. 735 ILCS 5/2—2103 (West 1996). Section 2—2104 provides that the design of a product or component shall be presumed to be reasonably safe unless the plaintiff can establish that, at the time the product left the manufacturer's control, "a practical and technically feasible alternative design was available that would have prevented the harm without significantly impairing the usefulness, desirability, or marketability of the product." 735 ILCS 5/2—2104 (West 1996). The fifth provision, section 2—2106, imposes a presumption that if written warnings are given to users of products, such warnings shall be deemed adequate if they conform to generally recognized standards in the industry at the time the product was introduced into the stream of commerce. 735 ILCS 5/2—2106 (West 1996).

We do not determine, in this case, whether or not the above product liability provisions are infirm as a matter of substantive constitutional law. We note that defendants, in addition to arguing in favor of the constitutionality of the provisions, have raised waiver and ripeness as reasons for this court to reject the circuit court's holding that the product liability provisions in issue are unconstitutional. For example, defendants

contend that plaintiff Best waived his challenge to the filing of a certificate of merit because he did, in fact, obtain and file an expert's affidavit in support of his cause of action. Plaintiff Best responds that his filing of the product liability certificate of merit was done under protest, without waiving his challenge. Defendants also challenge, at this early stage in the litigation, the ripeness of a constitutional challenge to the provisions which allow product liability defendants to benefit from evidentiary presumptions. Plaintiffs dispute defendants' ripeness argument and urge this court to resolve the constitutionality of the provisions under review.

We believe that we should exercise caution and restraint in making any ruling, apart from our severability holding, on the constitutionality of these product liability provisions. Without indicating how this court might rule in a future case involving a possibly reenacted version of the challenged provisions, we simply note that if we were to hold that the provisions in issue were not facially invalid, we would be rendering an advisory opinion on a portion of Public Act 89—7 that has been held inseverable from the unconstitutional provisions. If we were to hold that some but not all five of the provisions were unconstitutional, we would be making a selective determination of individual provisions within the larger product liability scheme that is contemplated by the instant Act. We decline to engage in speculative analysis or to render an advisory opinion on the efficacy of the product liability provisions where, as in the instant case, such analysis or opinion is not necessary for the disposition of the cause.

In conclusion, although the circuit court declared the product liability provisions of the Act invalid, as well as the provisions setting forth three jury instructions to be given in tort actions, we decline to reach the substantive merits of the constitutional challenges made

to those provisions for the reasons stated. Accordingly, we vacate that portion of the circuit court's holding that reached the substantive merits of the products liability issues and the jury instructions, but otherwise affirm the judgment of the circuit court in its entirety. We emphasize that all of the remaining provisions of Public Act 89—7, which were not challenged in the instant cases, are deemed invalid in this case solely on grounds of severability. As such, the General Assembly is free to reenact whatever provisions it deems desirable or appropriate.

The problems addressed in the briefs and in oral arguments in the case at bar represent some of the most critical concerns which confront our society today. We acknowledge and wish to commend the attorneys for the plaintiffs, the defendants, *amici*, and Attorney General on the scholarly and impressive briefs and oral arguments submitted by each.

*Circuit court judgment affirmed.*

JUSTICE HEIPLE took no part in the consideration or decision of this case.

JUSTICE BILANDIC, specially concurring:

I concur in the majority's judgment invalidating Public Act 89—7 in its entirety. I write separately to state that I do not join in the majority's discussion of the constitutionality of the damages cap under the separation of powers doctrine as that discussion is wholly unnecessary and constitutes *dicta*.

JUSTICE MILLER, concurring in part and dissenting in part:

I joined the court's opinion in *Kunkel v. Walton*, 179 Ill. 2d 519 (1997), and therefore I concur in the portion of the present judgment that reaffirms our holding in that case. I do not agree with the majority's disposition

of the remaining issues addressed in the present opinion, however, and accordingly I dissent from those portions of the majority opinion.

## I

Legislation is presumed to be valid, and a party challenging the constitutionality of a statute has the burden of establishing its invalidity. *DeLuna v. St. Elizabeth's Hospital*, 147 Ill. 2d 57, 67 (1992); *Pre-School Owners Ass'n of Illinois, Inc. v. Department of Children & Family Services*, 119 Ill. 2d 268, 275 (1988); *Sayles v. Thompson*, 99 Ill. 2d 122, 124-25 (1983). This court's role in evaluating these provisions is necessarily limited. Our function here is not to determine whether the legislature has chosen the best or most effective means of resolving the problems addressed in the legislation. "Our nation was founded in large part on the democratic principle that the powers of government are to be exercised by the people through their elected representatives in the legislature, subject only to certain constitutional limitations. Although this court has never hesitated to invalidate laws that it believes to be unconstitutional, we emphasize that our role is a limited one. The issue here is 'not what the legislature should do but what the legislature can do.' [Citation.]" *People v. Kohrig*, 113 Ill. 2d 384, 392-93 (1986). Accordingly, the question before this court is not whether the measures contained in the Civil Justice Reform Amendments of 1995 (the Act) are wise, but simply whether they are constitutional. *Bernier v. Burris*, 113 Ill. 2d 219, 229-30 (1986).

Our cases have repeatedly recognized that no one possesses a vested right in the continuation of any particular remedy or mode of recovery. *First of America Trust Co. v. Armstead*, 171 Ill. 2d 282, 291 (1996); *Bernier v. Burris*, 113 Ill. 2d 219, 236 (1986); *Trexler v. Chrysler Corp.*, 104 Ill. 2d 26, 30 (1984). Subject only to the collec-

tive will of the voters and to the constraints of the federal and state constitutions, the legislature enjoys broad power to change the common law, and to modify and even eliminate statutory and common law rights and remedies. In *People v. Gersch*, 135 Ill. 2d 384, 395 (1990), this court explained, "The legislature is formally recognized as having a superior position to that of the courts in establishing common law rules of decision. The Illinois General Assembly has the inherent power to repeal or change the common law, or do away with all or part of it. [Citations.]" "[T]his pervasive power of the legislature to alter the common law" (*Gersch*, 135 Ill. 2d at 395) reflects the legislature's superior role in articulating public policy. In *Collins v. Metropolitan Life Insurance Co.*, 232 Ill. 37, 44 (1907), this court explained the proper hierarchy between the legislative and judicial branches in matters of public policy:

> "When the sovereign power of the State has by written constitution declared the public policy of the State on a particular subject, the legislative and judicial departments of the government must accept such declaration as final. When the legislature has declared, by law, the public policy of the State, the judicial department must remain silent, and if a modification or change in such policy is desired the law-making department must be applied to, and not the judiciary, whose function is to declare the law but not to make it."

See also *Roanoke Agency, Inc. v. Edgar*, 101 Ill. 2d 315, 327 (1984) (quoting *Collins*); *Stroh v. Blackhawk Holding Corp.*, 48 Ill. 2d 471, 483 (1971) (same).

Our cases are replete with references to the legislature's authority to determine public policy, to prescribe solutions to problems, and to alter the common law. For example, in *Maki v. Frelk*, 40 Ill. 2d 193, 196 (1968), this court declined to adopt a system of comparative negligence, concluding instead that "such a far-reaching change, if desirable, should be made by the legislature rather than by the court. The General Assembly is the

department of government to which the constitution has entrusted the power of changing the laws." Although this court later decided to adopt comparative negligence on its own, without waiting for legislative action (see *Alvis v. Ribar*, 85 Ill. 2d 1 (1981)), the court did so not because it believed that the legislature lacked the authority to make that change, but for other reasons. Later, the legislature rejected the pure form of comparative fault adopted by this court in *Alvis*, replacing it with a modified version (735 ILCS 5/2—1116 through 2—1118 (West 1996)), which has withstood constitutional challenge (see *Reuter v. Korb*, 248 Ill. App. 3d 142 (1993)).

More recently, in *Committee for Educational Rights v. Edgar*, 174 Ill. 2d 1, 29-32 (1996), this court declined to rule that the current method of funding public schools is unconstitutional, deciding instead to defer to the legislature's superior ability to establish public policy and to devise appropriate answers to questions facing our society. Although it is certainly true that the power of the legislature to act in a particular field is not a license to act unconstitutionally, the legislature generally enjoys broad discretion in its determinations of public policy.

The majority does not disagree with these basic principles of review, yet the court reaches conclusions that are far different from what our precedents require, and that strike at the heart of the venerable and fundamental relationship between the legislative and judicial branches. The majority undermines these principles when it effectively substitutes its own view of public policy for the legislature's considered judgment.

## II

The majority devotes a substantial part of its opinion to a discussion of the $500,000 limit imposed by the Act on the recovery of noneconomic losses in personal injury

actions. The majority's principal conclusion is that the statute violates the Illinois Constitution's prohibition on special legislation. Ill. Const. 1970, art. IV, § 13. Applying the rational basis test, the majority assiduously attempts to locate its special legislation analysis within the framework of our case law, but the majority's analysis actually marks a significant departure from precedent.

The Act's limitation on the recovery of noneconomic damages is found in section 2—1115.1 of the Code of Civil Procedure (735 ILCS 5/2—1115.1 (West 1996)). Section 2—1115.1(a) provides:

"In all common law, statutory or other actions that seek damages on account of death, bodily injury, or physical damage to property based on negligence, or product liability based on any theory or doctrine, recovery of noneconomic damages shall be limited to $500,000 per plaintiff. There shall be no recovery for hedonic damages."

Noneconomic damages are defined as "damages which are intangible, including but not limited to damages for pain and suffering, disability, disfigurement, loss of consortium, and loss of society." 735 ILCS 5/2—1115.2(b) (West 1996). In contrast, economic damages, upon which no limit is imposed, are "all damages which are tangible, such as damages for past and future medical expenses, loss of income or earnings and other property loss." 735 ILCS 5/2—1115.2(a) (West 1996). The amount of the limitation on noneconomic damages is to be adjusted annually to reflect changes in the consumer price index. 735 ILCS 5/2—1115.1(b) (West 1996).

"It is well settled that review of a special legislation challenge is governed by the same standard that applies to review of equal protection challenges. [Citations.]" *Cutinello v. Whitley*, 161 Ill..2d 409, 417 (1994). The statute at issue does not impinge on a fundamental right or delimit a suspect or quasi-suspect classification, so the appropriate standard of review that governs the plain-

tiffs' special-legislation challenge is the rational basis test, as the majority correctly determines. A court applying this standard must decide whether the challenged classification is rationally related to a legitimate governmental interest. *Nevitt v. Langfelder*, 157 Ill. 2d 116, 125 (1993); *Chicago National League Ball Club, Inc. v. Thompson*, 108 Ill. 2d 357, 368 (1985). The considerations that govern a court's review of a statute under the rational basis test are familiar and have been stated as follows:

"A statute will be held unconstitutional as special legislation and as violative of the equal protection guarantee only if it was enacted for reasons totally unrelated to the pursuit of a legitimate State goal. [Citation.] The legislature has broad latitude and discretion in drawing statutory classifications to benefit the general welfare, and the classifications it makes are presumed to be valid. A legislative classification will be upheld if any set of facts can be reasonably conceived which justify distinguishing the class to which the law applies from the class to which the statute is inapplicable. [Citations.]" *Bilyk v. Chicago Transit Authority*, 125 Ill. 2d 230, 236 (1988).

Contrary to the majority's holding, I would conclude that the limit on noneconomic losses contained in the Act does not violate the special legislation prohibition of the Illinois Constitution, for the provision at issue readily satisfies the requirements of the rational basis test. Reform of the civil justice system is surely a legitimate governmental goal, and imposing a $500,000 limit on the recovery of noneconomic damages is rationally related to those ends. Noneconomic losses by their nature resist precise measurement. Economic losses, which include items such as medical expenses, lost income, and lost support, are objective and are readily quantifiable. In contrast, noneconomic losses, which include pain and suffering, among other things, are subjective and therefore more difficult to quantify. There is great difficulty in determining proper compensation

for noneconomic losses, and awards for such damages will vary greatly from case to case. Thus, there is a rational basis for the legislature's decision to distinguish between economic and noneconomic damages.

Limiting compensation for noneconomic losses is rationally related to the objectives of the legislation. As the preamble to the Act evidences, the legislature was concerned about disparities, inconsistencies, and the lack of predictability in the awarding of noneconomic damages, and about the costs to society of unrestricted compensation for those damages. The legislature believed that imposing a limit on the recovery of noneconomic losses would promote fairness and would help reduce the costs of the tort system. Some will argue that the amount selected by the legislature in the provision at issue here is too low. Although that might be a valid objection to the Act as an expression of public policy, for each of us would probably set the limit at a greater or lesser level, it is not a constitutional defect in the legislation. Like a repose statute, the limit on the recovery of noneconomic losses reflects the balance struck by the legislature between an individual's interest in compensation for his or her own injuries, and the public's interest in an affordable system of tort law. See *Mega v. Holy Cross Hospital*, 111 Ill. 2d 416, 428 (1986).

Again, to uphold the statute we need not be convinced of the correctness of the legislature's judgment—we need only find that the question is debatable and that the legislature has adopted a rational means of achieving the desired ends. *Bernier v. Burris*, 113 Ill. 2d 219, 229-30 (1986). In *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 464, 66 L. Ed. 2d 659, 668-69, 101 S. Ct. 715, 724 (1981), the Supreme Court articulated the appropriate degree of deference:

"But States are not required to convince the courts of the correctness of their legislative judgments. Rather, 'those challenging the legislative judgment must convince

the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker.' *Vance v. Bradley*, [440 U.S. 93, 111, 59 L. Ed. 2d 171, 184-85, 99 S. Ct. 939, 949-50 (1979)]. [Citations.]

Although parties challenging legislation under the Equal Protection Clause may introduce evidence supporting their claim that it is irrational, *United States v. Carolene Products Co.*, [304 U.S. 144, 153-54, 82 L. Ed. 1234, 1242, 58 S. Ct. 778, 784 (1938)], they cannot prevail so long as 'it is evident from all the considerations presented to [the legislature], and those of which we may take judicial notice, that the question is at least debatable.' [304 U.S. at 154, 82 L. Ed. at 1243, 58 S. Ct. at 784.] Where there was evidence before the legislature reasonably supporting the classification, litigants may not procure invalidation of the legislation merely by tendering evidence in court that the legislature was mistaken."

Thus, under rational basis review, "a legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data. [Citations.]" *Federal Communications Comm'n v. Beach Communications, Inc.*, 508 U.S. 307, 315, 124 L. Ed. 2d 211, 222, 113 S. Ct. 2096, 2102 (1993).

In deciding that the cap on noneconomic losses is invalid special legislation, the majority tests the provision against specially selected hypothetical cases that are obviously designed to illustrate defects in the statute. 179 Ill. 2d at 402-03. The legislature, however, makes no pretense that the reform measures at issue here are a panacea for all the ills, perceived or otherwise, in our system of tort law. Nor is it necessary that legislation like this have such miraculous effect. Under rational basis review, we ask only whether the means chosen by the legislature are rationally related to the purposes of the law. In contrast to the examples posited by the majority, one could as easily select hypothetical cases that support and sustain the remedy devised by the legislature. We have never before required legislation under

rational basis scrutiny to qualify under a standard as rigorous as that applied by the majority. In *People v. Kohrig*, 113 Ill. 2d 384, 402-03 (1986), in the course of sustaining the validity of the mandatory seat belt law, we observed, " '[T]he law need not be in every respect logically consistent with its aims to be constitutional. It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it.' (*Williamson v. Lee Optical of Oklahoma, Inc.*, (1955), 348 U.S. 483, 487-88, 99 L. Ed. 2d 563, 572, 75 S. Ct. 461, 464.)"

Nor is today's decision compelled by *Wright v. Central Du Page Hospital Ass'n*, 63 Ill. 2d 313 (1976), *Grace v. Howlett*, 51 Ill. 2d 478 (1972), or *Grasse v. Dealer's Transport Co.*, 412 Ill. 179 (1952), as the majority believes. In all three cases the court found special legislation violations. The statutes at issue in those cases, however, were much different from the measure involved here. The statute challenged in *Wright* imposed a limit of $500,000 on the total amount of damages, both economic and noneconomic, that could be recovered by a plaintiff in a medical malpractice action. The court found the statute to be a violation of the special legislation prohibition, concluding that medical malpractice plaintiffs had been arbitrarily selected to bear the burden of being limited in the total amount of compensation they were allowed to receive for their injuries. Both these concerns are alleviated in the provision at issue here, which is broader in scope but narrower in effect: the statute applies to all actions for personal injury, but it limits only a plaintiff's recovery of noneconomic losses and does not impose any cap on the recovery of economic losses. Moreover, in *Anderson v. Wagner*, 79 Ill. 2d 295, 304-05 (1979), this court counseled that *Wright* should not be read "too broadly," noting that the statute in *Wright* could have prevented the full recovery of

medical expenses. *Anderson* rejected constitutional challenges, including one of special legislation, to a statute of limitations for medical malpractice actions.

*Grace* and *Grasse* are also distinguishable. The legislation challenged in *Grace* limited an injured plaintiff's ability to recover compensation for injuries incurred in traffic accidents, depending on whether the other party was using the vehicle for personal or commercial purposes. In *Grasse* a provision of the Worker's Compensation Act would have transferred an injured employee's action against a third-party tortfeasor to the plaintiff's employer if the third party's employee was also covered by the Act. In neither case was the court able to discern a rational basis for the classifications drawn by the legislature.

I believe that the opposite conclusion is required here. In contrast to the measures at issue in *Wright*, *Grace*, and *Grasse*, the limit on the recovery of noneconomic losses bears a rational relationship to a legitimate governmental purpose. Here, the legislature could find that a $500,000 limitation on noneconomic damages would reduce the costs to society of allowing compensation for damages that, by their nature, are subjective and difficult to measure. For these reasons, I would join the group of jurisdictions that have upheld, against corresponding challenges on equal protection grounds, similar limits on the recovery of damages in tort actions. See, *e.g.*, *Davis v. Omitowoju*, 883 F.2d 1155 (3d Cir. 1989) (applying Virgin Islands law; $250,000 limit on noneconomic damages in medical malpractice actions); *Boyd v. Bulala*, 877 F.2d 1191 (4th Cir. 1989) (applying Virginia law; $750,000 limit on damages in medical malpractice actions); *Fein v. Permanente Medical Group*, 38 Cal. 3d 137, 695 P.2d 665, 211 Cal. Rptr. 368 (1985); *Scholz v. Metropolitan Pathologists, P.C.*, 851 P.2d 901 (Colo. 1993) ($250,000 limit on noneconomic damages

and $1,000,000 on total damages in medical malpractice actions); *Johnson v. St. Vincent Hospital, Inc.*, 273 Ind. 374, 404 N.E.2d 585 (1980) ($500,000 limit on damages in medical malpractice actions); *Murphy v. Edmonds*, 325 Md. 342, 601 A.2d 102 (1992) ($350,000 limit on noneconomic damages in personal injury actions); *Etheridge v. Medical Center Hospitals*, 237 Va. 87, 376 S.E.2d 525 (1989) ($750,000 limit on damages in medical malpractice actions); *Robinson v. Charleston Area Medical Center*, 186 W. Va. 720, 414 S.E.2d 877 (1991) ($1,000,000 limit on noneconomic damages in medical malpractice actions).

Perhaps uncertain of its own conclusion, the majority opinion goes on to consider an alternative argument against the limit on noneconomic damages, hoping to persuade the reader by prolixity, if not by force of reasoning. Here, the majority finds that the limit on the recovery of noneconomic damages functions as a legislatively imposed remittitur and for that reason violates the separation of powers doctrine. The majority's discussion of this additional argument is entirely unnecessary, given the majority's prior holding that the same measure is invalid special legislation. On the merits, I disagree with the majority's conclusion that the cap on noneconomic damages improperly intrudes on the judicial power of remittitur. The challenged provision does not represent a finding about the evidence of any particular case, and it does not detract from the power of a court to reduce an award of damages in appropriate circumstances. Remittitur pertains to judges and juries, not the legislature; by characterizing the cap on damages as a remittitur, the majority is simply erecting and demolishing a strawman. The majority's broad holding on this question means, in essence, that the legislature may never impose a limit on damages, at least in common law actions. Given the implications of this holding

and the absence of any need to discuss the issue, I would not join this part of the majority opinion even if I agreed with the court that the caps provision was invalid special legislation.

### III

The majority's lengthy treatment of several other provisions of the Act is also superfluous, given the court's conclusion that the $500,000 limit on the recovery of noneconomic damages is invalid special legislation, and the court's subsequent holding that the damages cap is not severable from the remainder of the Act. The majority's discussion of these other issues is simply unnecessary to the court's resolution of the appeals and should be recognized as the *dicta* that it is.

First, the majority considers section 3.5 of the Contribution Act. The majority concludes that the new provision is internally inconsistent and could allow an improper "double reduction" of damages awarded to an injured employee in an action against a third-party tortfeasor. I agree with the defendants that the legislature could not have intended to permit a double reduction in damages and that the measure should be interpreted accordingly. In that manner, the constitutionality of the provision can be preserved.

The majority next considers the validity of the modification made to section 2—1117 of the Code of Civil Procedure (735 ILCS 5/2—1117 (West 1996)), abolishing joint and several liability. In discussing this provision the majority initially pursues several lines of thought until it finally settles on one, determining that the measure violates the special legislation prohibition of our state constitution because it selectively restores joint and several liability in medical malpractice cases in the event that the cap on noneconomic losses is found invalid. Although the purpose of the provision restoring joint and several liability in the area of medical mal-

practice might be somewhat obscure, I do not agree that it is unconstitutional on that ground alone. Separately, because I believe that the cap on noneconomic losses is not invalid for the reasons found by the majority, I cannot agree with the majority's conclusion that the provision restoring joint and several liability in medical malpractice cases has even been triggered.

The majority also considers the constitutionality of the physician-patient disclosure provisions. Just last month, in *Kunkel v. Walton*, 179 Ill. 2d 519 (1997), this court invalidated the same provisions. The majority in the present case now relies on a somewhat different rationale to reach the same conclusion. While I agree with the result, I do not agree with its alternative holding that the statutes violate a right of privacy that the majority locates in the "certain remedy" provision found in article I, section 12, of the Illinois Constitution (Ill. Const. 1970, art. I, § 12).

Contrary to the majority's view, our prior cases construing the "certain remedy" provision of the constitution have characterized it as an expression of a philosophy rather than as a guarantee of the continued existence of any particular cause of action or form of recovery. See *Mega v. Holy Cross Hospital*, 111 Ill. 2d 416, 424 (1986); *Sullivan v. Midlothian Park District*, 51 Ill. 2d 274, 277 (1972). It should be noted, moreover, that the majority's discussion of the certain remedy provision is entirely unnecessary, for the majority finds the discovery statutes invalid on the separate and independent ground that they violate the separation of powers doctrine.

IV

As a final matter, I disagree with the majority's conclusion that the portions of the Civil Justice Reform Amendments of 1995 found unconstitutional here and in *Kunkel v. Walton*, 179 Ill. 2d 519 (1997), cannot be

severed from the remainder of the Act and that the invalidity of those measures therefore dooms the entire body of legislation. Contrary to the majority's holding, there is compelling evidence that the legislature intended for the different provisions of the Act to be severable from each other.

The question of severability is essentially one of legislative intent. *People v. Warren*, 173 Ill. 2d 348, 371 (1996); *Tully v. Edgar*, 171 Ill. 2d 297, 313 (1996); *Russell Stewart Oil Co. v. State of Illinois*, 124 Ill. 2d 116, 128 (1988); *Springfield Rare Coin Galleries, Inc. v. Johnson*, 115 Ill. 2d 221, 237 (1986). As expressed by this court in *Fiorito v. Jones*, 39 Ill. 2d 531, 540 (1968):

> "The settled and governing test of severability is whether the valid and invalid provisions of the Act are 'so mutually "connected with and dependent on each other, as conditions, considerations or compensations for each other, as to warrant the belief that the legislature intended them as a whole, and if all could not be carried into effect the legislature would not pass the residue independently ***".' [Citation.] The provisions are not severable if 'they are essentially and inseparably connected in substance.' [Citations.]"

Notably, the Act contains an express severability clause, which states, "The provisions of this Act, including both the new and the amendatory provisions, are severable under Section 1.31 of the Statute o[n] Statutes." Pub. Act 89—7, § 990, eff. March 9, 1995. The general severability provision found in section 1.31 of the Statute on Statutes provides:

> "If any provision of an Act *** or application thereof to any person or circumstance is held invalid, such invalidity does not affect other provisions or applications of the Act which can be given effect without the invalid application or provision, and to this end the provisions of each Act *** are severable, unless otherwise provided by the Act." 5 ILCS 70/1.31 (West 1996).

Although the presence of an express severability clause

is not dispositive of the question, it does establish a presumption that the various provisions of a body of legislation are severable. *Jacobson v. Department of Public Aid*, 171 Ill. 2d 314, 329 (1996); *People ex rel. Chicago Bar Ass'n v. State Board of Elections*, 136 Ill. 2d 513, 532 (1990).

Moreover, the various provisions of the Act are not so interrelated that one must conclude that the elimination of the provisions struck down by the majority means that the remainder of the Act also falls. Although the majority characterizes the invalid portions of the Act as "core provisions" whose removal yields an unenforceable "residue" (179 Ill. 2d at 467), the remaining provisions are actually substantial measures in their own right that are independent of the provisions invalidated here. In *Grasse v. Dealer's Transport Co.*, 412 Ill. 179, 202 (1952), this court stated:

"The established rule is that only the invalid parts of a statute are without legal effect, unless all the provisions are so connected as to depend upon each other. [Citations.] If that which remains after the unconstitutional portion is stricken is complete in itself and capable of being executed wholly independently of that which is rejected, the invalid portion does not render the entire section or act unconstitutional."

Although all the provisions contained in the Act are related to tort law generally, they are not so intertwined or interrelated that the failure of any one measure, such as the provision limiting the recovery of noneconomic damages, necessitates the corresponding failure of any other measure, such as the provision requiring a certificate of merit in products liability actions. The limit on the recovery of noneconomic damages and the requirement of a certificate of merit function independently of each other, and there is no reason to believe that the legislature would not have enacted one in the absence of the other. Moreover, although the legislature might

have viewed the limit on noneconomic losses as one of the most significant parts of the legislative package, the invalidity of that provision does not undermine the operation of the remaining provisions. As this court explained in *People ex rel. Dougherty v. City of Rock Island*, 271 Ill. 412, 422 (1915):

" 'If a statute attempts to accomplish two or more objects and is void as to one, it may still be in every respect complete and valid as to the other; but if its purpose is to accomplish a single object, only, and some of its provisions are void, the whole must fail unless sufficient remains to effect the object without the aid of the invalid portion.' "

In the present case, whether the Act is viewed as having multiple purposes accomplished in multiple ways, or a single purpose accomplished in multiple ways, I believe that the legislature intended that the measures found invalid by the majority would be severed from the remaining provisions of the Act.

The Act itself contains further proof that the legislature believed that any portion found to be invalid would be severable. The provision restoring joint and several liability in medical malpractice actions in the event that the cap on noneconomic damages is found unconstitutional represents compelling evidence that the legislature intended for the various provisions of the Act—or at least the cap on damages, the crux of the majority's antiseverability argument—to be severable from the other. The majority believes that the provision restoring joint and several liability "demonstrates that key provisions of the Act are interconnected and mutually dependent upon each other" (179 Ill. 2d at 466) and thus supports a finding of nonseverability. In my view, however, the provision compels the opposite conclusion, for it establishes that the legislature was concerned about the possible invalidation of the cap on noneconomic damages and intended for the remaining portions of the Act to survive any adverse judicial ruling. Clearly,

the legislators would not have crafted a response to that contingency if they had thought that a ruling invalidating the limit on noneconomic damages would drag down the remaining provisions of the Act. Whether or not the legislature considered the cap on noneconomic damages to be the most important feature of the Act, as the majority asserts, it is clear that the legislature did not believe that the failure of that measure would doom the rest of the Act.

In sum, given the presence of a severability clause in the Act, the ability of the valid measures to stand independently of those found invalid, and the legislature's concern about a ruling striking down a portion of this body of legislation, I would conclude that the provisions found unconstitutional here are severable from the remainder of the Act.

\* \* \*

Although I agree with the majority that the physician-patient disclosure provisions are invalid, for the reasons expressed by the court in *Kunkel v. Walton*, 179 Ill. 2d 519 (1997), I do not agree that the limit on noneconomic damages is invalid special legislation or violates the separation of powers clause. Nor do I agree with the majority's further conclusion that the provisions found invalid here and in *Kunkel* are not severable from the remainder of the Act, and I would therefore consider in this appeal the plaintiffs' remaining challenges to the provisions of the Act. As I have noted, the judicial role in assessing the constitutionality of legislation is quite limited, and the majority's result here cannot be defended under traditional standards of review. Today's decision represents a substantial departure from our precedent on the respective roles of the legislative and judicial branches in shaping the law of this state. Stripped to its essence, the majority's mode of analysis simply constitutes an attempt to overrule, by judicial fiat, the considered judgment of the legislature.